## AUTOMOBILE TRADE ASSOCIATION OF MARYLAND, INC. ET AL. *v.* INSURANCE COMMISSIONER OF THE STATE OF MARYLAND

[No. 56, September Term, 1981.]

*Decided November 25, 1981.*

16

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Henry R. Lord,* with whom was *Cynthia J. Morris* on the brief, for appellant William H. Schaefer, Jr. and by *Stephen C. Winter,* with whom was *Robert J. Aumiller* on the brief, for other appellants.

*Michael L. Cohen, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Thomas P. Barbera, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here reject the invitation of appellants and cross-appellees, Automobile Trade Association of Maryland, Inc., et al. (the Dealers), to declare invalid certain parts of the regulations adopted by Maryland's Insurance Commissioner relative to credit life insurance. Because of our determination of those issues, we shall not be obliged to address the contentions of the Insurance Commissioner, appellee and cross-appellant. Thus, we shall affirm the judgment of the Circuit Court for Baltimore County entered after the filing of the carefully prepared, comprehensive opinion of Judge Alpert in that court.

## i The case

In 1970, the General Assembly adopted Ch. 416 of the Acts of that year. It created a new subtitle of Maryland Code (1957) Art. 48A entitled "Credit Life and Health Insurance," codified as §§ 436C — 436-O. Code (1957, 1979 Repl. Vol.) Art. 48A, §§ 26 and 436M empower the Insurance Commissioner to adopt rules and regulations.[1] This litigation stems

---

1. Section 26 states in pertinent part:

"(1) The Commissioner may make reasonable rules and regulations necessary for or as an aid to effectuation of any provision

from the adoption of Ch. 464 of the Acts of 1979, effective January 1, 1980, amending § 436H by the addition of a new subsection (g). It authorized the Commissioner, among other things, to establish maximum rates of commission.[2]

Regulations adopted by the Commissioner are the root of this controversy. The Dealers object to Regulation 436M-1.4.6.14, treating profits derived from reinsurance as a part of commissions; Regulation 436M-1.20, setting up maximum commissions; and Regulation 436M-1.21, providing that reinsurance agreements must be approved by the Commissioner.[3]

---

of this article. No such rule or regulation shall extend, modify, or conflict with any provision of this article or the reasonable implications thereof. . . . Prior to the adoption of any rule or regulation, or the amendment or repeal thereof, the Commissioner shall publish or otherwise circulate notice of the nature and purpose of his intended action and afford interested persons opportunity to submit data or views orally or in writing.

&ast; &ast; &ast;

"(4) The Commissioner shall comply with the provisions of Article 41, § 9 [relative to 'submi[ssion] to the Attorney General of Maryland for approval as to its legality,' etc.]."

Section 436M states in pertinent part:

"The Commissioner, after notice and hearing, may promulgate rules and regulations he deems appropriate and necessary for the supervision of this subtitle. . . ."

**2.** Section 436H (g) states:

"For the purpose of assuring that the credit life and credit health insurance operations of the insurer do not result in rates which are excessive in relation to benefits, do not endanger the solvency of the insurer so as to render its transaction of business hazardous to its policyholders or the public, and do not adversely affect other classes of business of the insurer, the Commissioner may establish:

(1) Maximum rates of commission which may be paid to agents or brokers.

(2) Standards for maximum amounts of dividends, retrospective rate credits, and any other form of refund or benefit to policyholders."

Chapter 610 of the Acts of 1981, not involved in the litigation here, added an additional reference to "involuntary unemployment benefit insurance operations . . . ."

**3.** Regulation 436M-1.4 states in pertinent part:

"**4.** *Definitions.*

When used in these regulations, the following words and terms have the following meanings unless otherwise indicated.

&ast; &ast; &ast;

The Automobile Trade Association of Maryland, Inc., together with certain dealers, and a number of individuals

4.6 'Commission.' Commission means all forms of compensation or remuneration including dividends, retrospective rating credits, or any other form of benefit, including but not limited to:

* * *

4.6.14 Dividends, profits, capital gains, commissions, or other benefits which may be reasonably anticipated under re-insurance agreements with any unauthorized reinsurer affiliated with or controlled by a licensed agent or broker, a creditor, or an affiliate, corporate parent, subsidiary, associate, director, officer, active or retired employee, or other representative of the creditor or the licensed insurance agent. An unauthorized re-insurer does not include any insurer authorized to do business in this State or any insurer qualified under Article 48A, § 436P, or any insurer meeting the qualifications of a nonadmitted accepted re-insurer."

Regulation 436M-1.20 provides in pertinent part:

"20.1 Maximum Commission. On all loans originating in Maryland, an insurer may not directly or indirectly pay, allow, or offer to pay any form of commission, as defined in § 4.6, in excess of the limits stated in these regulations on a form of credit life or credit health insurance regardless of whether the payment is made to a licensed agent, a creditor, or an affiliate, corporate parent, subsidiary, associate, director, officer, active or retired employee, or other representative of the creditor or the licensed insurance agent.

"20.1.1 The maximum commission payable to all payees on each policy of credit life or credit health insurance may not exceed a total of 36 percent of the premiums under the policy or of standard premium rates, whichever is less.

"20.1.2 Commission paid to a creditor, or an affiliate, corporate parent, subsidiary, associate, director, officer, active or retired employee, or other representative of the creditor, regardless of whether the payee is a licensed agent, may not exceed 32 percent of the premiums under the policy or of standard premium rates, whichever is less."

Regulation 436M-1.21 states:

"21.1 To permit the Commissioner to enforce the provisions of Regulation 20 with respect to that portion of commission defined by Subsection 4.6.14 and to permit the Commissioner to ascertain that there are no violations of Article 48A, Subtitle 15 and other applicable sections of Article 48A, a contract of re-insurance of credit life or credit health insurance on loans originating in Maryland may not be entered into, or continued, after the effective date of these regulations unless approved by the Commissioner and unless the re-insurer is licensed in Maryland, or qualifies under Article 48A, § 436P or is an accepted re-insurer.

"21.2 A person proposing to enter into a re-insurance treaty as described in this regulation or a person proposing to continue a treaty entered into before the effective date of these regulations shall submit the treaty to the Commissioner for his approval.

"21.3 If the Commissioner does not approve or disapprove the proposed or existing re-insurance treaty within 90 days after the date it is filed with him, the treaty shall be deemed to be approved.

who are stockholders and officers of automobile dealerships, licensed agents for insurance companies and otherwise involved insofar as credit life insurance and in some instances reinsurance, filed a bill of complaint in the Circuit Court for Baltimore County seeking a declaratory judgment and injunctive relief. They challenged the regulations to which we have previously made reference. That association was described in the amended bill of complaint as "a nonprofit trade association composed of automobile dealers, ... [its] member[ship] consist[ing] of approximately ... 400 licensed automobile dealers operating businesses in the State of Maryland [,] ... [many of whose members] have employees licensed as agents with various insurance companies who, pursuant to contractual arrangements with insurance companies, receive commissions as agents on the sale of credit life and credit health insurance to customers of the dealers."

The matter ultimately came on for hearing. The parties agreed to a statement of facts. The trial judge found the regulations valid. He also rejected certain contentions of the Commissioner. Both parties appealed. We acceded to the request of appellants and cross-appellants that we grant the writ of certiorari prior to hearing of the case by the Court of Special Appeals and that we advance the case for argument.

The Dealers contend: (1) Regulation 436M-1 and its enabling act violate the Contract Clause of the United States Constitution (U.S. Const. art. I, § 10); (2) the Insurance Commissioner lacks authority: (a) to create a distinction in the amount of commission that may be received by affiliated and nonaffiliated agents, (b) to "grant unto himself" the right to approve reinsurance treaties entered into by out-of-state reinsurance companies, and (c) to define broadly "commission" so as to include reinsurance profits and dividends; and (3) the administrative record is insufficient to support the regulation. Since we took the case to decide the

---

"21.4 The Commissioner may withdraw approval of a re-insurance treaty after a hearing held not less than 20 days after written notice to the insurer and the re-insurer."

issue of the validity of the statutes and regulations, we address that issue. Inasmuch as our determination is favorable to the Commissioner, we have no need in this instance to determine the validity of his contention.

It is elementary that appellate courts do not decide issues of constitutionality except as a last resort. Moreover, there would be no need to decide that issue if we were to find for the Dealers on their contentions relative to the adoption of the regulations. Hence, we shall consider the constitutional issue last.

### ii Power of the Commissioner

The Dealers at the outset allude to the doctrine of separation of powers as reflected in Maryland Declaration of Rights, Art. 8. The Dealers assert that because administrative officials have no inherent powers and may exercise only those powers which have been expressly granted to them by the General Assembly or which are necessarily or reasonably implied from those powers so granted, the Commissioner is without power here. They cite such cases as *Governor v. Exxon Corp.,* 279 Md. 410, 440-41, 370 A.2d 1102 (1977), *aff'd on other grounds,* 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978), and *Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816 (1956). Accordingly, it may be worthwhile to examine what was said in those cases.

In response to a contention that certain portions of an act constituted an unlawful delegation of legislative authority in violation of Declaration of Rights, Art. 8, Judge Eldridge said for the Court in *Exxon:*

"Ordinarily when legislative authority is delegated to administrative officials, there must be sufficient standards for the guidance of the administrative officials. However, it has been recognized that the complexity of modern economic conditions may make it impossible to tailor specific guidelines for every conceivable situation and that latitude in granting discretion is necessary. As stated in

*Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816 (1956):

> 'It is recognized that it would not always be possible for Legislature or City Council to deal directly with the multitude of details in the complex situations upon which it operates. . . . The modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases.'

*See also Montgomery County v. Walsh,* 274 Md. 502, 523-524, 336 A.2d 97 (1975), *appeal dismissed,* 424 U.S. 901, 96 S. Ct. 1091, 47 L.Ed.2d 306 (1976). It would obviously be impractical for the Legislature to set specific guidelines to govern all situations where exceptions to the divestiture dates would be reasonable or where it would be necessary for a producer or refiner to operate a service station on a temporary basis." *Id.* at 440-41.

We have heretofore set forth the statutory bases for the authority of the Commissioner. The argument here runs that the grant of power in § 26 (1) to the Commissioner is to make only such rules as are reasonable and necessary to effectuate the provisions of the article, that the authorization in § 436M is to adopt rules and regulations deemed "appropriate and necessary for the supervision of [the] subtitle," and that the bases of authority set forth in § 436H (g) are to assure that the credit health and credit life insurance operations do not result in rates which are excessive in relation to benefits, do not endanger the solvency of the insurer, and do not adversely affect other classes of business of the insurer. Thus, it is argued that "the General Assembly [has] carefully circumscribed the Commissioner's rulemaking authority" and hence he is without power to do that which he has done.

It is elementary that in examining the power of the Commissioner to issue regulations to implement the provisions of the Credit Life and Health Insurance subtitle of the Insurance Code, we should examine the provisions of that subtitle. This is so because the regulations must be read in the context of that enactment. The purpose of the subtitle is defined in § 436C (a) as "to promote the public welfare by regulating credit life insurance and credit health insurance." The terms used are defined. A limitation is placed upon the forms of credit life and credit health insurance to be issued. The amounts of payments are regulated. The term of such insurance under § 436F is to "commence on the date the debtor becomes obligated to the creditor, except that, if a group policy provides coverage with respect to existing obligations, the insurance on a debtor with respect to the indebtedness shall commence on the effective date of the policy." Individual policies issued are required to be delivered to the debtors, except that in the case of group insurance a certificate of insurance shall be issued to the debtor. Section 436G (b) specifies the contents of each individual policy or group certificate. The Commissioner by § 436H is vested with the power and authority to approve all forms to be used in connection with such insurance as well as the rates to be charged. The statute contains requirements as to refunds. All policies of credit life insurance and credit health insurance delivered or issued for delivery in this State are required by § 436J to be "only by an insurer authorized to do an insurance business [in this State] and shall be issued only through holders of licenses or authorizations issued by the Commissioner." There are statutory provisions relative to claims and to the option of a debtor "of furnishing the required amount of insurance through existing policies of insurance owned or controlled by him or of procuring and furnishing the required coverage through any insurer authorized to transact an insurance business within this State." Moreover, § 436C (a) states, "The provisions of this subtitle shall be liberally construed."

Senate Bill 542, which ultimately was enacted as Ch. 464 of the Acts of 1979, contained an authorization for the Com-

missioner to set maximum rates of commission with the proviso, "but the maximum rate may not be less than 30 percent of the premium for an agent who is not the general agent, and may not be less than 4 percent additional to be paid to an agent who is a general agent." This was stricken from the bill and replaced with the language now found in § 436H (g) (1), which we quoted in n.2. It is argued that "[b]y rejecting this language prior to the enactment, the General Assembly indicated that it did not intend to confer any authority on the Commissioner to create a two-tier commission structure." That does not follow. It can just as well be argued that the General Assembly, in its wisdom, deemed it a matter warranting further investigation and that this was a subject best committed to the discretion and expertise of the Commissioner. For that reason, we take a dim view of the Dealers' citation of 2A Sutherland, *Statutory Construction* § 48.8, at 224 (4th ed. 1973) and *Demory Brothers v. Bd. of Pub. Works,* 273 Md. 320, 329 A.2d 674 (1974), for their proposition that the rejection of an amendment by the Legislature indicates an intent not to include provisions embodied in the rejected amendment and their argument that "[t]he legislative action of rejecting the original text of the bill and deleting language should be accorded even more weight than the mere rejection of a proposed amendment to a bill." We point out that we have said that the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent. *See, e.g., Police Comm'r v. Dowling,* 281 Md. 412, 420-21, 379 A.2d 1007 (1977), and *Harden v. Mass Transit Adm.,* 277 Md. 399, 406, 354 A.2d 817 (1976).

It is obvious that any item of expense which takes a minimum of thirty-two cents out of every dollar by way of premium paid to an insurer has a substantial impact upon the financial health of that insurance company. Moreover, it has a direct bearing upon the ultimate charge to the insured since that commission is money never received by the insurer. We point out that the challenge here is not to the power of the Commissioner to set any rate of commission,

but to his right to determine that one class of agents should receive more than another. We conclude it was entirely within the power of the administrative agency to make the rule which differentiated between the commissions of affiliated and non-affiliated agents.

It must not be forgotten that Regulation 436M-1.21.1 relative to reinsurance treaties was amended on an emergency basis to incorporate the changes necessary by virtue of the adoption of Code (1957, 1979 Repl. Vol., 1980 Cum. Supp.) Art. 48A, § 436P by Ch. 571 of the Acts of 1980 concerning "fronting agreements." It forbade an authorized insurer to engage in such an agreement with an unauthorized insurer with respect to any insurance written or issued in this State.[4]

The type of reinsurance agreements used and the cost of such agreements have a distinct bearing upon the financial health of an insurance company. The General Assembly demonstrated its concern in this regard by its enactment of § 436P. We are of the view that adoption of the regulation governing reinsurance agreements, even with out-of-state firms, falls within the authority vested in the Commissioner.

---

**4.** Section 436P provides in pertinent part:

"(a) *Circumstances under which agreements prohibited; definition.* — After July 1, 1980, an authorized insurer issuing coverage under this subtitle may not engage in any 'fronting' agreement with an unauthorized insurer with respect to any insurance written or issued in this State. A 'fronting' agreement is an agreement by reinsurance or otherwise under which an authorized insurer transfers to one or more unauthorized insurers:

(1) Substantially the entire risk of loss under substantially all of the insurance written by the authorized insurer in this State;

(2) All of one or more kinds, lines, types, or classes of insurance;

(3) All of the business produced through one or more agents or agencies;

(4) All of the business in a designated geographical area; or

(5) All of the business written on one or more policy forms.

"(b) *Applicability of section to unauthorized insurer.* — For purposes of this section, an unauthorized insurer does not include an insurer that agrees to the requirements of subsection (c) of this section and on whose behalf is maintained security on deposit with the Commissioner in an amount, which when added to the actual capital and surplus of the insurer, is equal to the capital and surplus required of an authorized insurer under §§ 48 and 49 of this article. . . ."

The well-being of a company doing business in Maryland is just as much affected by a reinsurance agreement with an out-of-state firm as it is with one confining its activities to Maryland.

The definition of commissions in Regulations 436M-1.4.6 and 436M-1.4.6.14 are inextricably linked with § 436P. We regard it as within the power of the Commissioner to see that agents do not by sleight of hand evade the regulations otherwise applicable to their actions. Thus, the Commissioner had the power to define "commission" so as to include reinsurance profits and dividends.

The regulations treating as a part of commissions those profits derived from reinsurance, setting up maximum commissions, and providing that reinsurance agreements must be approved by the Commissioner do not run afoul of the prohibition in Art. 48A, § 26 (1) against "extend[ing], modify[ing], or conflict[ing] with any provision of . . . [Art. 48A] or the reasonable implications thereof." Given that which the Court said in *Exxon* relative to the power of an administrative agency to make rules and the statutory bases here, we regard the adoption of the contested regulations here by the Commissioner as within the grant of power to that administrative agency.

### iii The administrative record

The Dealers strongly contend:

"The administrative record leading to the adoption of the Regulation contains little or no evidentiary support for the challenged parts of the Regulation and contains no indication of the basis or rationale for adopting the challenged parts. In the absence of such information, the public and interested persons are prevented from knowing the purpose for the Regulation and the underlying facts and are left with no choice but to initiate protracted litigation to ascertain *after the fact* whether or not the Commissioner exercised his authority appropri-

ately and in accordance with constitutional and statutory requirements. At bottom, the insufficiency of the administrative record effectively precludes judicial review and necessitates remand to the Commissioner." (Emphasis in original.)

The Dealers overlook that what is done by an administrative agency in a quasi-legislative capacity differs from that done by it in a quasi-judicial capacity. For example, B. Schwartz, *Administrative Law* § 60 (1976) states:

"[T]here is a constitutional parallelism between rule-making and statute-making; neither agencies nor legislatures are required by due process to hold hearings before exercising legislative power. Nor are agencies, any more than legislatures, required to base their rules upon any recorded evidentiary foundation. Legislative or administrative hearings may provide a factual record upon which exercises of legislative power may be supported. But neither the statute or regulation depends for its validity upon the existence of such a record. There is the same presumption of the existence of facts to support a legislative enactment, whether a statute or regulation is at issue." *Id.* at 162-63.

In *Dep't of Nat. Res. v. Linchester,* 274 Md. 211, 334 A.2d 514 (1975), Judge Digges discussed for the Court an administrative agency acting in a quasi-legislative capacity:

"In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries . . .; furthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious,

oppressive or fraudulent manner." *Id.* at 224 (citing cases).

We have already determined that the Commissioner did not pass beyond the power granted to him by law. He was not acting in a fact-finding capacity when he adopted these regulations. Hence, we reject this argument of the Dealers.

### iv The Contract Clause

There is a facial appeal to the contention of the Dealers that these limitations on the amount of commissions impair the obligation of their preexisting contracts. For instance, 43 Am. Jur. 2d *Insurance* § 181, at 239 (1969) states, "[A] statute limiting the amounts which insurance companies may expend for securing new business does not apply to an existing long-term contract with a general agent, so as to reduce the amounts to be paid him under his contract." *Boswell v. Security Mut. Life Ins. Co.,* 193 N.Y. 465, 86 N.E. 532 (1908), is cited as authority for that statement. The contract setting the rate of commissions at issue in that case had been in existence for nearly five years and had about fourteen years to run when a new statute was enacted limiting expenses of life insurance companies, including commissions. The court did say:

> "We are of opinion that section 97 of the Insurance Law should not be construed as retroactive, and, therefore, it does not apply to the contract before us. If construed otherwise it would contravene the provision of the Federal Constitution that no state shall pass any law impairing the obligation of contracts. (Art. 1, sec. 10.)" *Id.* at 473.

However, the more recent opinions of the United States Supreme Court do not take such a simplistic view. *See generally* Annot., 57 L. Ed. 2d 1279 (1979).

In the recent case of *Garris v. Hanover Ins. Co.,* 630 F.2d 1001 (4th Cir. 1980), the court examined *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S. Ct. 2716, 57 L. Ed.

2d 727 (1978), and *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977), stating:

"It does not minimize the contemporary significance of *United States Trust and Allied Structural Steel* to note that they simply refine and update the traditional balancing test between reserved state police power and private contractual obligations that has always been required in Contract Clause analysis. In the process they have newly highlighted a number of factors critical to fair application of the test and have suggested a helpful staged sequence for analysis of these factors. While there might be some question about the precise stage at which the various factors are most appropriately considered, all can be taken into account in an analysis that asks in sequence: (1) Has there been an impairment of contractual obligation sufficiently severe to generate further constitutional concern? (2) If so, is the impairment nevertheless saved against constitutional infirmity because (a) it is imposed upon reasonable conditions that adequately protect the admittedly impaired interests, or (b) it is in any event reasonable and necessary to the accomplishment of a discernible public purpose lying within reach of the state's police power?" *Id.* at 1005.

To like effect, see the discussion by Judge Eldridge for this Court in *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 151-52, 389 A.2d 350 (1978).

In *Allied Structural Steel Co.,* Justice Stewart said for the Court:

"First of all, it is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. 'It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as

are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.' *Manigault v. Springs,* 199 U.S. 473, 480. As Mr. Justice Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357: 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.' " *Id.* at 241-42.

The Court then went on to say, "If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Id.* at 242 (emphasis in original). The Court then discussed *Treigle v. Acme Homestead Assn.,* 297 U.S. 189, 56 S. Ct. 408, 80 L. Ed. 575 (1936); *W. B. Worthen Co. v. Thomas,* 292 U.S. 426, 54 S. Ct. 816, 78 L. Ed. 1344 (1934); and *Home Bldg. & L. Assn. v. Blaisdell,* 290 U.S. 398, 54 S. Ct. 231, 78 L. Ed. 413 (1934). Justice Stewart then said for the Court:

"In applying these principles to the present case, the first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of

the nature and purpose of the state legislation." 438 U.S. at 244-45.

The importance of the public interest in the business of insurance was stated for the Court by Justice Brandeis in *O'Gorman & Young v. Hartf'd Ins. Co.*, 282 U.S. 251, 51 S. Ct. 130, 75 L. Ed. 324 (1931). Although in that case the challenge was on the basis of the fact that the method of regulation prescribed was unreasonable and thus deprived the plaintiff of due process of law, its facts are of interest here. New Jersey had enacted a statute stating that commissions for fire insurance should not be in excess of a reasonable amount, nor should they be in excess of that allowed to any one of the local agents of a company on such risks. O'Gorman held a contract terminable at will which was made with one company prior to the enactment of the statute. Commissions of twenty-five percent were to be paid under the terms of the contract. The second contract was made after the enactment of the statute. It provided for compensation of "what such services were reasonably worth." O'Gorman sought twenty-five percent. The New Jersey Court of Errors and Appeals had affirmed a judgment of the trial court holding that since twenty percent was the amount of commissions paid to some local agents, the effect of the legislation was to determine that a commission in excess of that amount was unreasonable. The Court said:

> "The business of insurance is so far affected with a public interest that the State may regulate the rates, *German Alliance Insurance Co. v. Lewis*, 233 U.S. 389; and likewise the relations of those engaged in the business, *LaTourette v. McMaster*, 248 U.S. 465; *Stipcich v. Metropolitan Life Insurance Co.*, 277 U.S. 311, 320. Compare *McCarter v. Firemen's Insurance Co.*, 74 N.J. Eq. 372, 382. The agent's compensation, being a percentage of the premium, bears a direct relation to the rate charged the insured. The percentage commonly allowed is so large that it is a vital element in the rate structure and may seriously affect the adequacy of the rate.

Excessive commissions may result in an unreasonably high rate level or in impairment of the financial stability of the insurer. It was stated at the bar that the commission on some classes of insurance is as high as thirty-five per cent. Moreover, lack of a uniform scale of commissions allowed local agents for the same service may encourage unfair discrimination among policy holders by facilitating the forbidden practice of rebating. In the field of life insurance, such evils led long ago to legislative limitation of agents' commissions.

"The statute here questioned deals with a subject clearly within the scope of the police power." *Id.* at 257.

A more recent and more concise statement of the place of insurance in the area of the police power of a state is contained in *California Auto. Assn. v. Maloney,* 341 U.S. 105, 109, 71 S. Ct. 601, 95 L. Ed. 788 (1951). There Justice Douglas said for the Court:

"What was . . . said [in *Noble State Bank v. Haskell,* 219 U.S. 104 (1911),] about the police power — that it 'extends to all the great public needs' and may be utilized in aid of what the legislative judgment deems necessary to the public welfare (p. 111) — is peculiarly apt when the business of insurance is involved — a business to which the government has long had a 'special relation.' [2] See *Osborn v. Ozlin,* 310 U.S. 53, 65, 66." *Id.* at 109-10.

The footnote refers to the fact that state regulation of the insurance business has been upheld in a wide variety of circumstances against the claim that the law violated the Due Process Clause of the Fourteenth Amendment, citing a number of cases. In *Osborn v. Ozlin,* 310 U.S. 53, 65, 60 S. Ct. 758, 84 L. Ed. 1074 (1940), Justice Frankfurter said for the Court, "Government has always had a special relation to insurance. The ways of safeguarding against the untoward

manifestations of nature and other vicissitudes of life have long been withdrawn from the benefits and caprices of free competition."

For purposes of our decision we assume, arguendo, that the modification of the contractual obligation here is sufficiently severe to generate further constitutional concern. However, the commission allowed by the Commissioner is a substantial one, particularly when one considers that the agent is not obliged to go out and sell the way certain other insurance agents may be obliged to do. His customer is already present in that the customer is in the process of purchasing a motor vehicle which he expects to finance. Moreover, the agent is not required to maintain an office solely for his insurance business. The amount of commission allowed adequately protects the admittedly impaired interest. In any event, however, that which is done here is reasonable and necessary to the accomplishment of the discernible public purpose of assuring the solvency and financial well-being of credit life insurance companies operating within the State of Maryland. This is a discernible public purpose clearly lying within reach of the State's police power.

*Judgment affirmed; appellants to pay the costs.*