Mr. Robert M. Eubanks, III Insurance Commissioner 400 University Tower Building Little Rock, Arkansas 72204
Dear Mr. Eubanks:
This is in response to your request for an opinion regarding the forty percent compensation cap imposed upon credit life insurance agents by A.C.A. 23-87-117, and Arkansas Insurance Department Rule and Regulation 12 adopted pursuant thereto. Specifically, you have asked whether the cap is violated in the following situation:
 Agent A is appointed by Company A to market the Company A product and receive a forty percent commission which is the maximum allowed under Regulation 12. Company B is an insurance company located in another jurisdiction, is not licensed in Arkansas, and is owned by Agent A. Company A reinsures Agent A's sales of credit insurance with Company B, thus increasing the book value of Agent A's stock in Company B.
It is the increase in book value of Agent A's stock in Company B which arguably violates the compensation cap. You have also asked whether it is within your authority under 23-87-117 to define compensation to include this increase in book value. Additionally, you have noted that the agreement in the hypothetical above should be considered as one entered into after January 27, 1986. For the reasons that follow, it is my opinion that the answer to both of your questions is "yes".
The relevant statutory provision is A.C.A. 23-87-117 which provides:
 In order to assure that the premium rates charged or to be charged for credit life or credit disability insurance are reasonable in relation to benefits provided, the commission may, after due notice and a hearing, issue rules and regulations establishing the maximum compensation payable to an agent, broker, or a creditor, or any affiliate, associate, subsidiary, director, officer, employee, or other representative of or for the creditor, for writing or handling the insurance, including commission, dividends, premium adjustments, policy writing fees, underwriting gain, or any compensation or remuneration in whatever form.
The statute was enacted for the stated purpose and presumably to remedy the situation discussed in Credit Insurance General Agents Association of California, Inc. v. Payne, 128 Cal.Rptr. 881,547 P.2d 993 (1976), wherein it was stated:
 . . . because the debtor is in an inferior bargaining position in relation to the agent — the captive market effect — insurers tend to compete by offering successively higher commissions to their agents rather than by extending better insurance coverage to debtors. Thus, in the absence of regulation of these commissions, competition among insurance carriers tends to create pressure to allocate an increasing amount of the premium paid by the debtor for commissions and a decreasing amount of the premium for insurance coverage or services rendered in connection with this coverage — the reverse competition effect.
 547 P.2d at 995
Regulation 12, 14 adopted pursuant to 23-87-117, provides in pertinent part:
 14.1 As to credit life or credit disability insurance written by or through a creditor, or any affiliate, associate, subsidiary, director, officer, employee or other representative of or for such creditor, or by or through any agent or broker, all compensation for writing of handling such insurance SHALL NOT EXCEED FORTY PERCENT (40%) of the maximum premiums permitted therein.
14.2 COMPENSATION SHALL INCLUDE, BUT SHALL NOT BE LIMITED TO, THE RECEIPT DIRECTLY OR INDIRECTLY OR RECIPROCALLY OF:
 (a) Commissions, contingent commissions, service fees, policy fees, expense allowances or reimbursements, dividends or other distribution of earnings based solely upon the profits derived from issuing or reinsuring any policy of credit life or credit disability insurance; and
 (b) Gifts, all benefits such as items of merchandise, equipment, travel, conventions, vacations, rewards, bonuses, trading stamps, scripts, or any other form of remuneration resulting directly or indirectly from the sale of credit insurance or as an inducement to or payment for sales made or volumes of sales obtained; and
. . .
 (d) Any amounts or things of value received from or paid by any person other than an insurer in consideration of the sale or retention of credit insurance.
14.3 Compensation shall not include:
 (a) Reinsurance premiums paid to or underwriting profits generated by an insurer or reinsurer not owned by, controlled by or under common control with a credit insurer, an agent, broker, creditor, group of creditors, or any affiliate, associate, subsidiary, director, officer, employee or other representative of or for such credit insurer, creditor or group of creditors; and
 (b) REINSURANCE PREMIUMS PAID TO OR UNDERWRITING PROFITS GENERATED BY, AN INSURER OR REINSURER OWNED BY, CONTROLLED BY OR UNDER COMMON CONTROL WITH A CREDIT INSURER, an agent, broker, creditor, group of creditors, or any affiliate, associate, subsidiary, director, officer, employee or other representative of or for such credit insurer, creditor or group of creditors, ON ACCOUNTS IN EXISTENCE WITH SUCH INSURER OR REINSURER ON JANUARY 27, 1986. . . . (Emphasis added).
Subsection 14.3(b) above, often referred to as a "grandfather clause," appears to address the remuneration received in the hypothetical you have posed, providing only that underwriting profits generated by an agent-controlled insurer on accounts existing prior to the stated date are not "compensation."* The necessary implication of this clause is that underwriting profits generated from accounts created after January 27, 1986 are included in the definition of "compensation." The remaining issue is whether "underwriting profits" include the increase in book value of the stock.
It is necessary, however, to determine under which specific provision the scheme you have outlined falls. Both the statute and the regulation are drafted extremely broadly. The statute authorizes regulation of "remuneration in whatever form", and the regulation details some forms of compensation, but specifically provides that the list is not exclusive. It is therefore my opinion that it is within your authority to define compensation as including the increase in book value as outlined in your hypothetical.
Additionally, in light of the purposes of the legislation, (Ark. Code Ann. 23-87-117), in my opinion receipt of such increase in book value of stock, which must eventually be reduced to tangible form, would violate the compensation cap set out in Regulation 12. A similar conclusion was reached in an analogous situation in Automobile Trade Association of Maryland Inc. et al., v. Insurance Commissioner of Maryland, 437 A.2d 199, 292 Md. 15 (1981) wherein it was stated:
 The type of reinsurance agreements used and the cost of such agreements have a distinct bearing upon the financial health of an insurance company. The general Assembly demonstrated its concern in this regard by its enactment of § 436P. We are of the view that adoption of the regulation governing reinsurance agreements, even with out-of-state firms, falls within the authority vested in the Commissioner. The well-being of a company doing business in Maryland is just as much affected by a reinsurance agreement with an out-of-state form as it is with one confining its activities to Maryland.
The definition of commissions in regulations 436M-1.4.6 and 436M-1.4.6.14 are inextricably linked with § 436P. We regard it as within the power of the Commissioner to see that agents do not by slight of hand evade the regulations otherwise applicable to their actions. Thus, the Commissioner had the power to define "commission" so as to include reinsurance profits and dividends.
437 A.2d at 204.
This conclusion is also consistent with two opinions of the Attorney General of Tennessee. See Tennessee Op. Nos. 84-001 and 84-229.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elana L. Cunningham.
* We express no opinion upon the legality or propriety of the "grandfather clause", as none has been requested.