577 A.2d 27

**EAST PRINCE FREDERICK CORPORATION**

v.

**BOARD OF COUNTY COMMISSIONERS OF CALVERT COUNTY, Maryland.**

**No. 118, Sept. Term, 1989.**

Court of Appeals of Maryland.

July 31, 1990.

Karl G. Feissner (Eric S. Slatkin, Feissner & Slatkin, on brief), Burtonsville, for petitioner.

Mary M. Krug (Allen S. Handen, Handen and Krug, on brief), Prince Frederick, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ.

ADKINS, Judge.

Whether Calvert County's "use-it-or-lose-it" sewer and water allocation policy violates the Contract Clause of the United States Constitution is the issue before us.[1] Perceiving no constitutional violation, we affirm the judgment of the Court of Special Appeals.

---

1. Article I, § 10, Clause 1 of the United States Constitution provides in pertinent part that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...."

## I.

The facts that frame the controversy are reasonably straightforward. In July, 1978 petitioner, East Prince Frederick Corporation (EPF), (actually, its predecessor in interest), paid a capital connection fee of $11,000 to respondents, the Board of County Commissioners of Calvert County (Calvert County), (actually, its predecessor, Calvert County Sanitary District, Inc.), to reserve a daily allocation of 4,400 gallons of sewer and water usage. The allocation was to serve a planned "shopping strip." The document granting the allocation contained no temporal limit on its duration; so far as the document is concerned, it might be read to grant a 4,400 gallon reservation of capacity in perpetuity. Certainly, it was in no way conditioned on EPF's use of the allocation by any specified time.

Although EPF expended $85,000 to $90,000 to install water and sewer lines on its property, the "shopping strip" has never been constructed. The reasons for this are not entirely clear. The fault may be attributed partially to EPF, and partially to various governmental actions, including the State Highway Administration's refusal to permit access from the property to a State highway. In any case, EPF has never hooked up to Calvert County's sewer and water system; the 4,400 gallon daily allocation remains unused by EPF and unavailable to anyone else.

In 1983, faced with a total lack of additional water and sewer capacity, Calvert County adopted Resolution 37–83. The resolution set forth "procedures for submitting formal requests for sewage allocation, and establishe[d] Reserved and Standby Sewerage Allocation Lists to provide allocated sewerage capacity for developers." The policy established by the resolution was that "approved [but unused] sewerage allocations" were to remain in effect for two years. After that, the allocation would be cancelled and one-third of the capital connection fee returned to the holder of the allocation. In the alternative, the holder could continue the reservation by either (a) paying debt service and minimum

user charges or (b) certifying that the property was at a certain stage of development.

After some interim modifications, Resolution 37–83 was replaced, in 1986, by Resolution 60–86. This in pertinent part provided:

7) Allocations remain with the development as long as the following payment criteria [are] maintained.

\* \* \* \* \* \*

c) If unused after two years from site plan approval, minimum user fees and debt service payments are due.

d) If the above ... criteria [are] not met, ... the allocation is forfeited.

In 1985, Calvert County began billing EPF for minimum user charges. By the time of the trial in the Circuit Court for Calvert County (August, 1988), a sum of approximately $6,000 was claimed.

The trial in the circuit court was occasioned by EPF"s request for a judicial declaration that "any policy adopted by the Board of County Commissioners regarding sewer allocations adopted after July, 1978 be held to be inapplicable as to [EPF] and the 4,400 gallon capacity owned by [EPF]." EPF also asked that Calvert County be enjoined "from cancelling or in any way restricting the allocation of 4,400 gallons of sewer capacity owned by [EPF]." The corporation's chief argument in the circuit court was that the 1983 and 1986 resolutions unconstitutionally impaired the obligations of the allocation contract between it and Calvert County.

The circuit court agreed and granted the relief requested. It found that

the application of a two year time limit or minimum user fees to [EPF] would constitute a substantial impairment of its rights. [Calvert County] presented evidence that the reason for the new sewage policy is the limited sewer capacity in [the county]. The Court finds that although this is good reason to limit new allocations, no evidence

was presented which would indicate that it was either necessary or reasonable to limit [EPF's] rights under the original agreement.[2]

The Court of Special Appeals reversed. Reasoning that Calvert County could not grant a sewer and water allocation in perpetuity, the appellate court concluded that EPF's contract had not been substantially impaired. *Board v. East Prince*, 80 Md.App. 78, 85, 559 A.2d 822, 825 (1989). It held in the alternative that even if a substantial impairment had been effected, there was no violation of the Contract Clause because the policy established by the 1986 resolution was reasonable and necessary to serve an important public purpose. *Id.* at 86–87, 559 A.2d at 825–826. We issued a writ of certiorari at the behest of EPF. 317 Md. 609, 565 A.2d 1033 (1989).

---

2. The declaration of rights entered by the circuit court stated "that the policies adopted by [Calvert County] after July of 1978 regarding sewer allocations are inapplicable to the 4,400 gallon capacity owned by [EPF]." It seems clear to us that this declaration was based on the Contract Clause, the only legal issue discussed by the circuit court in its 7 November 1988 Opinion and Order of Court. We note this because EPF suggested to the Court of Special Appeals and suggests to this Court that if the circuit court was wrong in its Contract Clause analysis, then the case should be remanded there for determination of another issue—the inapplicability of the 1986 resolution to EPF as a matter of statutory construction. This theory was probably not presented by EPF's complaint, and was not argued orally in the circuit court. It was raised by EPF (and answered by Calvert County) in post-trial memoranda.

Although the circuit court opinion is silent on the matter, we believe the judge must have decided this issue against EPF. If the 1986 resolution did not apply to EPF as a matter of statutory construction, then no Contract Clause issue was even before the court. Had the circuit court agreed with EPF's statutory construction argument, it would have decided the case on that basis, and would have had no need to reach the constitutional question. "It is elementary that appellate courts do not decide issues of constitutionality except as a last resort." *Automobile Trade Ass'n v. Ins. Comm'r*, 292 Md. 15, 21, 437 A.2d 199, 202 (1981). The same principle applies at the trial court level. We assume the circuit court was aware of it, heeded it, and therefore decided that the 1986 resolution did apply to EPF as a matter of statutory construction. *See Capers v. State*, 317 Md. 513, 519, 565 A.2d 331, 333–334 (1989).

## II.

The Court of Special Appeals applied the proper framework of analysis to the Contract Clause issue. The vigor and frequency with which the Contract Clause has been deployed to attack an alleged impairment of the obligations of public contracts has varied over time. *See Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2720–2721, 57 L.Ed.2d 727, 734 (1978); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 14–15, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92, 104–105 (1977); L. Tribe, *American Constitutional Law* § 9–11, at 619–620 (2d ed. 1988). But whatever the history may be, *United States Trust Co.* makes it clear that the Clause presently is available as a potent weapon for that purpose. *See also Allied Structural Steel Co.* (dealing with impairment of the obligation of a private contract). Although the Clause is not to be read literally, *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 502, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472, 499 (1987), and does not obliterate the power of a State to govern, *id.* at 503–504, 107 S.Ct. at 1251–1252, 94 L.Ed.2d at 500, it can operate to void a state's attempt to abrogate a contract the state has made, *United States Trust Co., supra.*

The Contract Clause analysis is applied in the manner explained by Judge Eldridge, for the Court, in *Robert T. Foley Co. v. W.S.S.C.,* 283 Md. 140, 151, 389 A.2d 350, 357 (1978):

First, it must be determined whether a contract existed. If that hurdle is successfully cleared by the claimant, a court next must decide whether an obligation under that contract was changed. Finally, ... the issue becomes whether the change unconstitutionally impairs the contract obligation, "[f]or it is not every modification of a contractual promise that impairs the obligation of contract under federal law...." *City of El Paso v. Simmons,* 379 U.S. 497, 506–507, 85 S.Ct. 577, 582–583, 13 L.Ed.2d 446[, 453–454] (1965).

*See also Md. State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353, 1358–1360 (D.Md.1984), *aff'd,* No. 84–2213 (4th Cir. 5 Dec.1985).

The final step is the most difficult one, for it involves the determination of whether the impairment was reasonable and necessary to serve an important public purpose. If it was, the impairment is not unconstitutional. *United States Trust Co.,* 431 U.S. at 25, 97 S.Ct. at 1519, 52 L.Ed.2d at 112; *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 438, 54 S.Ct. 231, 240, 78 L.Ed. 413, 429 (1934); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 272, 554 A.2d 366, 375, *cert. denied,* —— U.S. ——, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989); *Chevy Chase Savings & Loan v. State,* 306 Md. 384, 416, 509 A.2d 670, 686–687 (1986).

Bearing these precepts in mind, we turn to the case before us.

## III.

Calvert County does not argue that there was no contract between it and EPF. The trial court seems to have found that there was one and that its terms were that in exchange for the payment of $11,000 by EPF, Calvert County would set aside for that corporation 4,400 gallons of daily water and sewage capacity, this being "a permanent reservation with no restrictions on when [EPF] was to begin using the capacity." Like the circuit court and the Court of Special Appeals, we shall assume that this was the contract.[3]

We shall also assume, *arguendo,* that the "use-it-or-lose-it" policy substantially changed the contract. That is, we assume the impairment was substantial enough to compel us to move to the third step of the analysis. Before the

---

**3.** Whether Calvert County could bind itself to such a contract in perpetuity (*i.e.,* whether the Board of County Commissioners could bind all future boards) and whether a contract of this nature is subject to an implied "reasonable time" limitation are questions of interest, but they have not been raised in this case and their resolution is not necessary to our decision, so we do not decide them.

adoption of the "use-it-or-lose-it" policy, EPF had an unfettered contractual right to a water and sewer allocation; afterwards, the right was conditioned on payment of annual charges. That impairment is more than the *de minimis* changes involved in *Board of Trustees v. City of Baltimore,* 317 Md. 72, 101, 562 A.2d 720, 734 (1989) (Initial cost of ⅟₃₂ of 1 percent of pension trust's assets and ongoing annual cost of ⅟₂₀ of 1 percent might slightly diminish level of future variable benefits, but not so much as to approach constitutional standard for impairment.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). *See also State v. Good Samaritan Hospital,* 299 Md. 310, 321–322, 473 A.2d 892, 897–898 (corporate charter is a contract, but it is not impaired by exercise of police power regulating industry of which corporation is a part), *dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984).

But although we assume impairment here, we must pause to review its severity, for the severity of the impairment has a bearing on how closely a court will scrutinize the governmental action. *See, e.g., Allied Structural Steel Co.,* 438 U.S. at 245, 98 S.Ct. at 2722–2723, 57 L.Ed.2d at 736–737. In that case, the contract, a private one, was a pension plan to which only the employer contributed and which the employer could amend or terminate. The impairment was a Minnesota statute that imposed a "pension funding charge" on a corporation if it, among other things, closed a Minnesota office when the corporation's pension fund was insufficient to cover benefits for all employees who had worked at least ten years for the corporation. This included many who would not have been vested under Allied's plan. The Supreme Court characterized this impairment as severe. 438 U.S. at 246, 98 S.Ct. at 2733, 57 L.Ed.2d at 737. The impairment "nullifie[d] express terms of the company's contractual obligations, and impose[d] a completely unexpected liability in potentially disabling amounts." *Id.* at 247, 98 S.Ct. at 2724, 57 L.Ed.2d at 738.

In *United States Trust Co.,* the impairment was total, since the "outright repeal" of a statutory covenant with

bondholders "totally eliminated an important security provision and thus impaired the obligation of the States' contract." 431 U.S. at 19, 97 S.Ct. at 1516, 52 L.Ed.2d at 108. There was substantial impairment in *Keystone Bituminous Coal Ass'n* as well. In *Keystone,* mining companies had obtained damage waivers from landowners of land surface areas from whom the companies had purchased underground mineral rights. The statute under attack, in effect, prevented the mining companies from extracting some of the coal they had acquired from the landowners by preventing the companies from holding the surface owners to those original waivers of liability for surface damage. 480 U.S. at 504, 107 S.Ct. at 1252, 94 L.Ed.2d at 500.

The impairment is not as great in this case. EPF can choose between losing its allocation and retaining it for future use, although the latter course of action imposes some financial burden on it. The relative amount of that burden, however, is not great. But more important is the existence of the option. In *Burning Tree,* we assumed a substantial impairment of contractual obligation, but found no constitutional violation because the Burning Tree Club could choose either to change its discriminatory policies and retain a preferential tax assessment, or to retain the discriminatory policies and lose the tax break. 315 Md. at 272, 554 A.2d at 375. *See also Md. State Teachers Ass'n,* 594 F.Supp. at 1362 (In finding that State action did not violate the Contract Clause the court pointed out that modified pension plans for teachers and state employees permitted those individuals to select between new plans, including one that offered all prior benefits, but at an increased cost.).

▮ Thus we have only a modest degree of impairment with respect to an area (regulation of public water and sewer systems) in which a party must anticipate extensive governmental activity. *See Robert T. Foley,* 283 Md. at 152, 389 A.2d at 357. In a heavily state-regulated area, the individual's expectations of immutability of contract are reduced, and change is more readily upheld. *Energy Reserves Group v. Kansas Power & Light,* 459 U.S. 400,

413–416, 103 S.Ct. 697, 705–707, 74 L.Ed.2d 569, 583–584 (1983); *Chevy Chase,* 306 Md. at 411–412, 509 A.2d at 684. But since there is (as we assume) an impairment, we proceed to the next step of the analysis.

EPF does not seriously question that Calvert County's policy was designed to further a significant and legitimate public purpose. The purpose was to provide a sewer and water system designed to protect public health and welfare and to foster reasonable growth in the county. *See Burning Tree Club,* 315 Md. at 272, 554 A.2d at 375 (significance and legitimacy of public purpose to eliminate State-sanctioned sex discrimination "is beyond doubt"); *Chevy Chase,* 306 Md. at 416, 509 A.2d at 686–687 (Purpose "to quell further panic by preventing illiquidity in member associations not in conservatorship or receivership" is significant and legitimate public purpose of state in dealing with the savings and loan emergency.); *Automobile Trade Ass'n v. Ins. Comm'r,* 292 Md. 15, 33, 437 A.2d 199, 208 (1981) ("[P]ublic purpose of assuring the solvency and financial well-being of credit life insurance companies operating within the State of Maryland" is "discernible public purpose ... within reach of the State's police powers."). The debate is about whether the "use-it-or-lose-it" policy was a reasonable and necessary way of advancing that important public purpose.

The circuit court believed that "no evidence was presented which would indicate that it was either necessary or reasonable to limit [EPF's] rights under the original agreement." If by this the court meant that Calvert County had presented no evidence on these subjects, the court was correct. All testimony was introduced through witnesses produced by EPF and all exhibits but one were introduced by that party. But, if the court meant that the record was devoid of evidence on these topics, it was clearly incorrect. We accept that Calvert County bore some burden with respect to evidence of reasonableness and necessity. *See United States Trust Co.,* 431 U.S. at 30–31, 97 S.Ct. at 1522, 52 L.Ed.2d at 114–115 (State failed to demonstrate

that its repeal of 1962 covenant was necessary or reasonable). But that burden could be sustained by evidence in the record, even if the evidence was produced by EPF. The evidence in the record is uncontradicted.

In 1983, when Calvert County first began to act on the problem of the lack of sewer and water capacity, no additional capacity was available. That which existed had been fully allocated. The same conditions persisted when this case came to trial. Part of the problem was that in 1981 State authorities had reduced the Prince Frederick sewage treatment plant design capacity from 170,000 gallons per day to 137,000 gallons. In any case, those who wished to obtain sewer and water allocations could not do so. So great was demand that in 1985 the County quit adding names to the waiting list for allocations. Whether Calvert County could have foreseen these developments in 1978 is doubtful. What is not doubtful is that it was reasonable to take some action to alleviate the problem. Something had to be done to achieve orderly administration of the sewer system.

Was what Calvert County did necessary? If this case involved a contract between two private parties, we would defer to the governmental determination in this regard. *Keystone Bituminous Coal Ass'n,* 480 U.S. at 505, 107 S.Ct. at 1253, 94 L.Ed.2d at 501; *Energy Reserves Group,* 459 U.S. at 412–413, 103 S.Ct. at 705, 74 L.Ed.2d at 581. But we are aware that when the government itself is a party to the contract,

> complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*United States Trust Co.*, 431 U.S. at 26, 97 S.Ct. at 1519, 52 L.Ed.2d at 112 [footnote omitted]. So we examine the necessity for the Calvert County policy. But while we must not be deferential to the county commissioners, neither is "strict scrutiny" required. *Md. State Teachers Ass'n,* 594 F.Supp. at 1361.

EPF, taking its cue from the aforegoing quotation from *United States Trust Co.,* argues that the imposition of the user charge as an alternative to forfeiture of the allocation, was simply a method of raising money to help fund a poverty-stricken system. We agree that government cannot justify contractual impairment "simply because it would rather spend the money for some other public purpose." *Md. State Teachers Ass'n,* 594 F.Supp. at 1361. But that is not what happened here.

As we have observed, the trial court record shows that water and sewer system capacity in Calvert County had been exhausted. That system, like any of its kind, was designed to accommodate a certain capacity. And, as the testimony showed, the user fees not only covered the operation of the system but also its maintenance. This was crucial, for as the testimony also showed, this system was short of funds. If all of those with reserved allocations were using the system, it is reasonable to infer that the maintenance costs would be covered by the fees. But with only a fraction of those with reservations using the system the maintenance costs could not be met. As the Court of Special Appeals explained, "[i]f [EPF] did not use its allocation within this normal course of time, it was reasonable and necessary to require that [EPF] begin paying the minimum amount that that allocation would have been expected to generate when the capacity was originally set aside." *Board v. East Prince,* 80 Md.App. at 87, 559 A.2d at 826. Unless the system was being used by all those who had allocations, the funds for its maintenance would be deficient. The "use-it-or-lose-it" policy, with its user fee option, was intended to assure the integrity of the system by addressing this problem.

In addition, the lack of capacity gave the County a reason to encourage those who were not apt to use their reservations in the foreseeable future to give them up to someone who would use the allocation immediately. This would ensure the payment of user fees, as well as promote active construction projects. Counties grow, and an important governmental objective is controlling that growth appropriately by assuring that scarce resources are available to projects, such as hospitals, schools, shopping centers, and residential communities that are ready to proceed, as contrasted with those that do not have all legal permits for completion.

The necessity prong of the analysis also involves an inquiry into whether "a less drastic modification" would have been sufficient to achieve the governmental goal. *United States Trust Co.*, 431 U.S. at 29–30, 97 S.Ct. at 1521, 52 L.Ed.2d at 114. "[A] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id.* at 31, 97 S.Ct. at 1522, 52 L.Ed.2d at 115.

EPF does not help us by suggesting what lesser measures might have sufficed. It does assert that the problem might have been more readily solved had certain persons who had swapped rights-of-way for allocation been included in the "use-it-or-lose-it" policy; these persons were exempted under the 1983 resolution. This circumstance no longer exists because the 1986 resolution—the only one in effect at the time of trial—does not exempt them. Calvert County submits that the 1986 policy applies to everyone, and that assertion is consistent with the resolution's language. When government has made a showing as to reasonableness and necessity commensurate with the interest impaired, we think it incumbent on the party claiming that the impairment is unconstitutional to suggest what less drastic measures might be adequate to the task at hand. *See Nevada Employees Assoc. v. Keating*, 903 F.2d 1223, 1228 (9th Cir.1990), *Md. State Teachers Ass'n*, 594 F.Supp. at 1371. EPF failed to do so.

Given that the impairment here was not "drastic" or severe, we conclude that Calvert County has made a sufficient showing of reasonableness and necessity to accomplish an important public purpose to sustain its "use-it-or-lose-it" policy. This case is closer to *Burning Tree* and *Chevy Chase* than it is to *Allied Structural Steel Co.* or *United States Trust Co.* Calvert County's action did not unconstitutionally impair any obligation of its contract with EPF.[4]

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.

---

**4.** The Court of Special Appeals observed that the Attorney General apparently had not been given notice of EPF's declaratory judgment action and certainly had not participated in it. *Board v. East Prince,* 80 Md.App. 78, 80 n. 1, 559 A.2d 822, 822 n. 1 (1989). That court also correctly noted that Maryland Code (1989 Repl.Vol.) § 3–405(c) of the Courts and Judicial Proceedings Article requires the Attorney General to be notified and to be given an opportunity to be heard when a declaratory judgment action alleges that a "statute, municipal or county ordinance, or franchise is ... unconstitutional." *East Prince,* 80 Md.App. at 80 n. 1, 559 A.2d at 822 n. 1. Noncompliance with § 3–405(c) has not been raised in this case, and the statutory requirement does not affect subject-matter jurisdiction. *Gardner v. Board,* 320 Md. 63, 74, 576 A.2d 208, 213 (1990). Nor need we decide whether this requirement, like the nonjurisdictional issues of exhaustion of administrative remedies and primary jurisdiction, is a matter we must address *nostra sponte. Comm'n on Human Rel. v. Mass Transit,* 294 Md. 225, 232, 449 A.2d 385, 388 (1982) (exhaustion of administrative remedies); *Clinton v. Board of Education,* 315 Md. 666, 677 n. 9, 556 A.2d 273, 279 n. 9 (1989) (primary jurisdiction).

While the sanction for noncompliance with § 3–405(c) "may well be to vacate the judgment and remand for further proceedings after notice to the Attorney General," *Gardner,* 320 Md. at 75, 576 A.2d at 214 there is no need to do that here, as there was no need to do so in *Gardner.* The purpose of § 3–405(c) is to allow the Attorney General to " 'decide whether the State, with the forces it can muster, should step in and support the enactment.' " *Gardner,* 320 Md. at 72, 576 A.2d at 212 (quoting *Sendak v. Debro,* 264 Ind. 323, 327, 343 N.E.2d 779, 781 (1976)). Since we have found "the enactment" of Calvert County to be constitutional, no purpose would be served by allowing the Attorney General to be heard on that issue in the trial court.