847 A.2d 427

**UNIVERSITY SYSTEM OF MARYLAND, et al.**

v.

**The BALTIMORE SUN COMPANY, et al.**

No. 138, Sept. Term, 2002.

Court of Appeals of Maryland.

April 15, 2004.

Mark J. Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellants.

Mary R. Craig (Mary R. Craig, P.A., on brief), Towson, for appellees.

Argued before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

**BELL, C.J.**

This case concerns a request to the University of Maryland, College Park ("UMCP") for public records, made by The Baltimore Sun and Jon Morgan, one of its sports reporters (collectively, the "appellees") pursuant to the Maryland Public Information Act (hereafter "the MPIA"). The MPIA is codified at Maryland Code (1984, 1999 Repl.Vol., 2001 Cum.Supp.) §§ 10–611 *et seq.* of the State Government Article.[1]

## I.

This case had its genesis when the appellees made a written MPIA request to the Athletic Department of UMCP seeking "copies of the original and revised employment contracts for head football coach Ralph Friedgen . . . . [and] any separate letters of understanding, side letters or similar documents specifying incentives, bonuses, broadcast agreements, athletic footwear contracts, and other matters concerning the terms and conditions of [Coach Friedgen's] employment and compensation." In response, University Counsel disclosed that Coach Friedgen's annual salary was $183,920,[2] and denied the remainder of the request, citing § 10–616(i)[3] and § 10–617(f),[4]

---

1. Unless otherwise noted, all statutory references hereinafter are to these provisions of the State Government Article.

2. Ms. Andrews reported that Coach Friedgen's salary was originally $175,000 as of November 30, 2000. As of January 1, 2002, however, Coach Friedgen's salary was $183,920.

3. Section 10–616, as relevant, provides:

    "(a) *In general.*—Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section.

    . . .

    "(i) *Personnel Records.*—(1) Subject to paragraph (2) of this subsection, a custodian shall deny inspection of a personnel record of an individual, including an application, performance rating, or scholastic achievement information

    "(2) A custodian shall permit inspection by:

    "(i) the person in interest; or

which prohibit the disclosure of personnel and certain financial information.

Dissatisfied with the UMCP's response, the appellees retained counsel, who sought reconsideration of UMCP's decision to disclose only those documents related to Coach Friedgen's salary and to refuse disclosure of documents "describing other employment related compensation due" him. They argued that UMCP's reliance on § 10–616(i) and § 10–617(f) was flawed because UMCP improperly and narrowly interpreted the term, "salary," and, at the same time, improperly construed the term, "personnel," broadly, both inconsistently with the "bias in favor of disclosure recognized by the courts."[5]

---

"(ii) an elected or appointed official who supervises the work of the individual."

. . .

4. Section 10–617, as relevant, provides:

"(a) *In general.*—Unless otherwise provided by law, a custodian shall deny inspection of a part of a public record, as provided in this section.

. . .

"(f) *Financial information.*—(1) This subsection does not apply to the salary of a public employee.

"(2) Subject to paragraph (3) of this subsection, a custodian shall deny inspection of the part of a public record that contains information about the finances of an individual, including assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness.

"(3) A custodian shall permit inspection by the person in interest."

5. The appellees relied on an opinion of the Attorney General, 83 Op. Att'y Gen. 192 (Md.1998), *available at* 1998 Md. AG LEXIS 35 (Opinion No. 98–025, December 18, 1998), in which the term, "salary," was given a broad construction, to include "records that reflect the earnings of government officers and employees, whether those earnings consist solely of a regular salary or are augmented by a bonus or performance award." The Attorney General reasoned:

"In our opinion, the General Assembly enacted the 'salary' provisions of the PIA to ensure that members of the public could find out how much public employees earned. The term 'salary' should be construed to help achieve this objective. Giving 'salary' too narrow a construction would allow governments to secretly augment the earnings of public employees through bonuses and performance awards, contrary to the General Assembly's goal of holding a government publicly accountable for its compensation decisions. Under the PIA,

The UMCP was not persuaded and maintained its position. Responding to the appellees' request for reconsideration, it wrote:

"Although we understand the MPIA's general construction favoring disclosure of public records, we remain constrained by its specific prohibitions. With respect to the Baltimore Sun's request, the MPIA expressly requires us to deny inspection of Coach Friedgen's personnel records, as well as any part of a record that contains information about his finances, including income. (*See* §§ 10–616(i) and 10–617(f) of the MPIA). The only exception to these requirements is limited to his "salary" as a State employee. (*See* §§ 10–611(g)(2) and 10–617(f)(1) of the MPIA).

"With respect to salary, we have concluded, in consultation with the Maryland Attorney General's Office, that the MPIA requires the disclosure of the total amount of an employee's State earnings."

Nonetheless, perhaps in an attempt to avoid the threatened lawsuit, Coach Friedgen voluntarily agreed to provide additional information about his compensation. Accordingly, the UMCP disclosed the following additional information:

"Coach Friedgen receives a salary of $179,753 in 2001–2002. Also, he has earned the maximum amount of compensation for competitive achievement (ACC Championship and BCS Bowl), automobile allowances, radio and television appearances and apparel/endorsement compensation, which totals $762,000. The availability of student athlete academic achievement and citizenship bonuses is evaluated subsequent to the completion of the fiscal year."

In the meantime and prior to receipt of the additional information voluntarily disclosed by Coach Friedgen, the appellees made another MPIA request of the UMCP Athletic

---

to borrow a phrase from an Ohio court, 'the public has an absolute right to ascertain the earnings of its servants.' *State ex rel. Jones v. Myers,* 61 Ohio Misc.2d 617, 581 N.E.2d 629, 631 (Ohio Com.Pl. 1991)."
*Id.* at 194.

Department, this one seeking information with respect to the compensation and income of UMCP's head basketball coach, Gary Williams.[6] The University responded to that request as follows:

"Except for salary of a State employee, the MPIA requires State agencies to deny access to personnel records and financial information of an individual, including income. See § 10–616(i) and § 10–617(f) of the MPIA. Therefore, University of Maryland legal counsel has advised Intercollegiate Athletics to provide the following information in response to your request.

"Coach Gary Williams receives a regular salary of $202,991 in FY 2002. To date, he has also earned $540,400 for competitive achievement (ACC Regular Season Championship and NCAA National Championship), automobile allowance and radio, television and personal appearances. The availability of additional University compensation based upon student-athlete academic achievement and NCAA compliance is evaluated at a later date. His apparel/endorsement compensation is received directly from the apparel company.

"We must decline to provide you with copies of Coach Williams' employment contract and/or any other records in the University's possession pertaining to other income,

---

6. The MPIA request relating to Coach Williams was significantly broader than that pertaining to Coach Friedgen. It sought:

"1. All employment contracts and any revised contracts for head basketball coach Gary Williams together with all attachments and amendments to any contracts;

"2. Any contract or other record describing the payment of any incentive, bonuses, broadcast fees, athletic clothing or footwear fees to Williams by the University or any third party;

"3. Any report or other record of any athletically related compensation received by Williams from any source outside the University including but not limited to income, annuities, sports camps, housing benefits, complimentary ticket sales, television and/or radio fees, endorsements or consultation contracts with athletic shoe, apparel or equipment manufacturers; and

"4. Any notices to the University or other record of any items described in paragraphs 1–3 or approval of the same by the University."

which Coach Williams may receive directly from outside sources (e.g., apparel/equipment endorsements, sports camps, consulting, speaking engagements outside the scope of the contract, etc.) Such documents would constitute personnel records and/or contain personal financial information other than the salary of a State employee, and their disclosure is prohibited under § 10–616(i) and § 10–617(f) of the MPIA."

Thus, UMCP reaffirmed its previously communicated interpretation of the MPIA and, accordingly, refused to disclose any information relating to Coach Williams' non-University related income. Nor did it disclose a copy of Coach William's University contract.

The appellees filed suit in the Circuit Court for Prince George's County, naming as defendants the University System of Maryland, Deborah A Yow, Ph.D., the athletic director at UMCP, and David Haglund, the assistant director of Intercollegiate Athletics at UMCP (collectively, the "appellants" or the "University"). The parties filed cross-motions for summary judgment, at the center of which was the question whether the University was required to disclose, not only each coach's total salary from the University, but, the underlying contracts and agreements relating to each coach's income. The appellants argued that the plain language of the applicable sections of the MPIA statute requires state agencies to deny disclosure of a state employee's personnel and financial records, with a narrow exception for salary derived from State funds. The appellees, on the other hand, maintained that the records sought were subject to the mandatory disclosure requirements of the MPIA and that the appellant's interpretation "accords broad secrecy to the terms of a state employee's compensation contrary to the MPIA's mandate that the salary of public employees should be a matter of public record."

The trial court found in favor of the appellees. It reasoned: the legislature has directed that the MPIA "shall be construed in favor of permitting inspection" of public records; the term "salary" unambiguously is included in the definition of "public record" in § 10–611(g)(2); the financial records exclusion con-

tained in § 10–617(f) does not apply to the salary of a public employee; and, salary related documents are not personnel records within the meaning of the statute. Consequently, the trial court granted the appellees' motion for summary judgment and denied the appellants' cross-motion. Accordingly, the court ordered that the records requested by the appellees be produced.[7] The court instructed that, to the extent that salary information and personnel records coexist in the same document, the personnel information should be redacted before the records are delivered to the appellees.

The appellants moved to alter or amend the judgment, in an attempt to have any references to payments to the coaches from third parties deleted from the court's order. They argued, in that regard, that such payments did not constitute "salary" of a public employee and pointed out that the appellees requested information only about payments to the coaches "by the State University from public funds" and indicated that the records it sought did "not reveal anything about the coaches' personal finances other than how much taxpayer

---

7. The trial court's order listed the records to be disclosed, as follows:

   "a. The original and revised employment contract for head football coach Ralph Friedgen;

   "b. Any separate letter of understanding, side letters or similar documents specifying incentives, bonuses, broadcast arrangements, athletic footwear contracts and other matters concerning the terms and conditions of Coach Friedgen's employment and compensation;

   "c. All employment contracts and any revised contracts for head basketball coach Gary Williams together with all attachments and amendments to any contract;

   "d. Any contract or other record describing the payment of any incentives, bonuses, broadcast fees, athletic clothing or footwear to Williams by the University or any third party;

   "e. Any report or other record of any athletically related compensation received by Coach Williams from any source outside the University including but not limited to income, annuities, sports camps, housing benefits, complimentary ticket sales, television and/or radio fees, endorsements or consultation contracts with athletic shoe, apparel or equipment manufacturers; and

   "f. Any notice to the University of Maryland or other record of any item described in paragraphs [ ]b–d of this order or approval of the same by the University."

   The order required the disclosure to be made within thirty-one (31) days of the order.

money they are paid from their public employment." The trial court denied that motion, whereupon the appellants timely noted an appeal to the Court of Special Appeals. Prior to any proceedings on the merits in the intermediate appellate court,[8] this Court, on its own initiative, issued a writ of certiorari. *University System of Maryland v. The Baltimore Sun Co.*, 374 Md. 81, 821 A.2d 369, (2003).

### III.

We recently considered the applicability of the MPIA in *Hammen v. Baltimore County Police Department*, 373 Md. 440, 455–456, 818 A.2d 1125, 1134–36 (2003). In that case, we commented that the MPIA requires that a "custodian shall permit a person ... to inspect any public record at any reasonable time" except as otherwise provided by law. *Id.*, citing § 10–613.[9] We explained that the "provisions of the ... Act reflect the legislative intent that the citizens of the State of Maryland be accorded *wide-ranging access* to public infor-

---

**8.** Prior to this Court's grant of certiorari, the Court of Special Appeals entered an order remanding the case to the trial court for compliance with Maryland Rule 2–601(a). Maryland Rule 2–601(a) provides:

"(a) Prompt entry—Separate document. Each judgment shall be set forth on a separate document. Upon a verdict of a jury or a decision by the court allowing recovery only of cost or a specified amount of money or denying all relief, the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise. Upon a verdict of a jury or a decision by the court granting other relief, the court shall promptly review the form of the judgment presented, and, if approved, sign it, and the clerk shall forthwith enter the judgment as approved and signed. A judgment is effective only when so set forth and when entered as provided in section (b) of this Rule. Unless the court orders otherwise, entry of the judgment shall not be delayed pending determination of the amount of costs."

The Court of Special Appeals "Ordered that appeal shall not be affected by the remand." By order dated April 16, 2003, the Circuit Court for Prince George's County entered an order pursuant to the remand and in accordance with the order of the Court of Special Appeals.

**9.** § 10–613. Inspection of public records.

(a) *In general.*—Except as otherwise provided by law, a custodian shall permit a person or governmental unit to inspect any public record at any reasonable time.

mation concerning the operation of their government." *Id.*, quoting *Kirwan v. The Diamondback*, 352 Md. 74, 81, 721 A.2d 196, 199 (1998) (emphasis in original). Moreover, we made clear that the MPIA "is to be construed in favor of disclosure." *Id.*, citing § 10–612(b).[10] *See also, Fioretti v. Maryland State Board of Dental Examiners*, 351 Md. 66, 73, 716 A.2d 258, 262 (1998) (" 'the provisions of the Public Information Act reflect the legislative intent that citizens of the State of Maryland be accorded wide-ranging access to public information concerning the operation of their government.' "), quoting *A.S. Abell Publishing Co. v. Mezzanote*, 297 Md. 26, 32, 464 A.2d 1068, 1071 (1983) (the provisions of the statute "must be liberally construed . . . in order to effectuate the Public Information Act's broad remedial purpose"); *Cranford v. Montgomery County*, 300 Md. 759, 771, 481 A.2d 221, 227 (1984); *Faulk v. State's Attorney for Harford County*, 299 Md. 493, 506–507, 474 A.2d 880, 887 (1984).

To be sure, the parties do not dispute that the records sought by the appellees are public records. They dispute only whether those records fall within the category of documents and/or information that the statute mandatorily instructs a custodian to deny,[11] or permit, inspection. As a preliminary

---

**10.** Section 10–612, General right to information, as relevant, provides:

"(a) *General right to information.*—All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees.

"(b) *General construction.*—To carry out the right set forth in subsection (a) of this section, unless an unwarranted invasion of the privacy of a person in interest would result, this Part III of this subtitle shall be construed in favor of permitting inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection."

. . .

**11.** " § 10–615. *Required denials—In general.*

"A custodian shall deny inspection of a public record or any part of a public record if:

"(1) by law, the public record is privileged or confidential; or

"(2) the inspection would be contrary to:

"(i) a State statute;

"(ii) a federal statute or a regulation that is issued under the statute and has the force of law;

matter, it is important to note the differences in the documents requested by the appellees and how these documents came to be public records. Both Coach Friedgen and Coach Williams are employees of the University of Maryland, College Park, a part of the University System of Maryland, an instrumentality of the State of Maryland. Consequently, both coaches are employees of the state of Maryland. Both also have entered into written agreements with the University, outlining the terms and conditions, including salary, of the employment arrangement. These written agreements, and any amendments thereto, similar to other government contracts, come under the definition of "public record" as § 10–611(g) [12] defines it, as they originated as documentary evidence in the transaction of public business. Indeed, § 10–611(g)(2) is clear, a public record "includes a document that lists the salary of an employee of a unit or instrumentality of the State

---

"(iii) the rules adopted by the Court of Appeals;
"(iv) an order of a court of record.

**12.** Section 10–611(g) provides:

"(g) *Public record.*—(1) 'Public record' mean the original or any copy of any documentary material that:
"(i) is made by a unit or instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and
"(ii) is in any form, including:
1. a card;
2. a computerized record;
3. correspondence;
4. a drawing;
5. film or microfilm;
6. a form;
7. a map;
8. a photograph or photostat;
9. a recording;
10. a tape.
"(2) 'Public record' includes a document that list the salary of an employee of a unit or instrumentality of the State government or of a political subdivision.

government or of a political subdivision." Clearly, employment contracts on file with the University are public records.

The University is a member of the National Collegiate Athletic Association ("NCAA").[13] Pursuant to NCAA regulations, contractual agreements between a member institution and its athletic coaches, and hence between UMCP and both coaches in this case, must include an express stipulation that NCAA Enforcement Provisions shall apply to the terms of the employment contract. § 11.2.1.[14] Violations of these provisions by a coach, it is further stipulated, can result in disciplinary or corrective action, including suspension without pay and termination, for serious and deliberate violation of NCAA regulations. § 11.2.1.1.[15] In addition, the NCAA bylaws, see § 11.2.2, provides that an athletic coach must report annually to the member institution the sources of his or her athletically related income from third parties.[16] To be sure, therefore,

---

"(3) 'Public record' does not include a digital photographic image or signature of an individual, or the actual stored data thereof, recorded by the Motor Vehicle Administration."

. . .

13. The NCAA "is a voluntary association of about 1,200 colleges and universities, athletic conferences and sports organization devoted to the sound administration of intercollegiate athletics." NCAA Online, (July 25, 2002) *available at http://ncaa,org/about/what_is_the_ncaa.html.*

14. *Stipulation That NCAA Enforcement Provisions Apply.* Contractual agreements or appointments between a coach and an institution shall include the stipulation that a coach who is found in violation of NCAA regulations shall be subject to disciplinary or corrective action as set forth in the provisions of the NCAA enforcement procedures."

15. *Termination of Employment.* Contractual agreements or appointments between a coach and an institution shall include the stipulation that the coach my be suspended for a period of time, without pay, or that the coach's employment may be terminated if the coach is found to be involved in deliberate and serious violations of NCAA regulations.

16. Section 11.2.2 of the NCAA Bylaws reads:

"11.2.2 Athletically Related Income. Contractual agreements, including letters of appointment, between a full-time or part-time athletic department staff member (excluding secretarial or clerical personnel) and an institution shall include a stipulation that the staff member is required to provide a written detailed account annually to

coaches may earn supplemental pay, § 11.01.7,[17] *see* § 11.3.2.1 ("A staff member may earn income in addition to the institutional salary by performing services for outside groups"); however, the NCAA recognizes the institution's control of the coaches' employment and salary, *see* § 11.3.1,[18] by both limiting and prohibiting the source of, and how, supplemental pay may be earned. Section § 11.3.2.2, for example, prohibits "[a]n outside source . . . from paying or regularly supplementing an athletic department staff member's annual salary and

the chief executive officer for all athletically related income and benefits from sources outside the institution. In addition, the approval of all athletically related income and benefits shall be consistent with the institution's policy related to outside income and benefits applicable to applicable to all full-time or part-time employees. Sources of such income shall include, but are not limited to, the following: (Revised 1/10/92, 1/11/94, 1/10/95, 4/26/01 effective 8/1/01)

"(a) Income from annuities;

"(b) Sports camps;

"(c) Housing benefits (including preferential housing arrangements);

"(d) Country club memberships;

"(e) Complimentary ticket sales;

"(f) Television and radio programs; and

"(g) Endorsement or consultation contracts with athletic shoe, apparel or equipment manufacturers."

17. The term "supplemental pay" is defined by NCAA Bylaw § 11.01.7 as "the payment of cash over and above an athletic department staff member's institutional salary by an outside source for the purpose of increasing that staff member's annual earnings (See Bylaw 11.3.2.2)." Bylaw 11.3.2.2, in turn, provides:

"*11.3.2.2 Supplemental Pay.* An outside source is prohibited from paying or regularly supplementing an athletic department staff member's annual salary and from arranging to supplement that salary for an unspecified achievement. This includes the donation of cash from outside sources to the institution earmarked for the staff member's salary or supplemental income. It would be permissible for an outside source to donate funds to the institution to be used as determined by the institution, and it would be permissible for the institution, at its sole discretion, to use such funds to pay or supplement a staff member's salary."

18. Bylaw, § 11.3.1, Control of Employment and Salaries, provides:

"The institution, as opposed to any outside source, shall remain in control of determining who is to be its employee and the amount of salary the employee is to receive within the restriction specified by NCAA legislation."

from arranging to supplement that salary for an unspecified achievement." Similarly, § 11.3.2.3 limits bonuses to "direct cash payment[s] in recognition of a specific and extraordinary achievement (e.g., contribution during career to the athletic department of the institution, winning a conference or national championship, number of games or meets won during career/season), provided such a cash supplement is in recognition of a specific achievement and is in conformance with institutional policy." Additionally, "An institution's coaching staff member may not promote a noninstitutional camp or clinic by permitting the use of his or her quotations and/or pictures in the camp or clinic brochure, unless that coaching staff member is employed by the camp." Bylaw § 11.3.2.6.

Consequently, pursuant to the NCAA reporting requirements with respect to the ability of athletic coaches to earn outside income, the University has come into possession of documents that contain references to contracts for remuneration, and other financial arrangements, between the coaches and third parties. These documents evidence, at least purportedly, income in addition to both coaches' state-provided salaries, i.e., in NCAA parlance, "institutional salary," *see* By–Law, § 11.01.7, that is derived from athletically related sources outside of the University. Again, the documents, as all parties agree, fall within the definition of "public record" as defined in § 10–611(g).

The interplay between the NCAA reporting requirements and the MPIA, as it relates to state employees, is, as we have said, at the heart of the dispute *sub judice.* Without the NCAA reporting requirement, the University, potentially, would not be in possession of the records the respondent seeks. Or, if both coaches were employed by a private university in Maryland, although subject to the same NCAA reporting requirements, the MPIA would not be applicable and the appellees could not compel their disclosure, since the MPIA does not apply to the business records of a private entity.

Whether, in this case, the records in the possession of the University need be disclosed depends solely upon the legislative intent in enacting the MPIA. That is a question of statutory construction, the principles of which are well settled. Most recently, the principal canons of statutory construction, and those relevant to the decision of the case *sub judice*, were reviewed by this Court in *Bank of America v. Stine*, 379 Md. 76, 85–86, 839 A.2d 727, 732–733 (2003):

"[T]he primary goal of [statutory construction is] to 'ascertain and effectuate the intention of the legislature.' *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995). In order to discern legislative intent, we first examine the words of the statute and if, giving them their plain and ordinary meaning, the statute is clear and unambiguous, we will end our inquiry. *Comptroller of the Treasury v. Kolzig*, 375 Md. 562, 567, 826 A.2d 467, 469 (2003). As we have recognized, however, '[a]n ambiguity may ... exist even when the words of the statute are crystal clear. That occurs when its application in a given situation is not clear.' *Blind Indus. & Servs. of Md. v. Md. Dep't of Gen. Servs.*, 371 Md. 221, 231, 808 A.2d 782, 788 (2002). Therefore, a statutory provision may be ambiguous: '1) when it is intrinsically unclear; or 2) when its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain.' *Gardner v. State*, 344 Md. 642, 648–49, 689 A.2d 610, 613 (1997). Further, 'when the statute to be interpreted is part of a statutory scheme, ... [we read it in context, together with the other statutes] on the same subject, harmonizing them to the extent possible....' *Mid–Atlantic Power Supply Ass'n v. Pub. Serv. Comm'n*, 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000). We also 'seek to avoid constructions that are unreasonable, or inconsistent with common sense,' *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994), and we will presume that 'the Legislature 'intends its enactments to operate together as a consistent and harmonious body of law,'" *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 220, 817 A.2d 229, 234 (2003), quoting *State v. Ghajari*, 346 Md. 101, 115, 695 A.2d 143, 149 (1997)

(quoting *State v. Harris*, 327 Md. 32, 39, 607 A.2d 552, 555 (1992)), so that 'no part of the statute is rendered meaningless or nugatory.' *Id.*, (citing *Gillespie v. State*, 370 Md. 219, 222, 804 A.2d 426, 428 (2002)); *see also Montgomery County v. Buckman*, 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994). In our endeavor to harmonize the provisions of all of the relevant statutes, this Court will prefer an interpretation that allows us to avoid reaching a constitutional question. *East Prince Frederick Corp. v. County Board of Comm'rs*, 320 Md. 178, 182, 577 A.2d 27, 29 (1990). *Automobile Trade Ass'n v. Ins. Comm'r*, 292 Md. 15, 21, 437 A.2d 199, 202 (1981)."

See *Comptroller of the Treasury v. Olaf A. Kolzig*, 375 Md. 562, 567–69, 826 A.2d at 469–70 (2003).

At the threshold, we point out that the MPIA does not require the carte blanche, and unrestricted disclosure, of all public records. To the contrary, it clearly requires the custodian of public records, in some circumstances, to deny inspection of public records and disclosure of specific information, e.g. §§ 10–616(i) and 10–617(f), and, in certain other circumstances, where disclosure would be contrary to the public interest, § 10–618,[19] gives the custodian discretion to deny

---

**19.** Section 10–618, "Permissible denials," as relevant, provides:

"(a) *In general.*—Unless otherwise provided by law, if a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of that part, as provided in this section.

\* \* \* \* \* \*

"(f) *Investigations.*—(1) Subject to paragraph (2) of this subsection, a custodian may deny inspection of:

"(i) records of investigations conducted by the Attorney General, a State's Attorney, a city or county attorney, a police department, or a sheriff;

"(ii) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose; . . . .

(2) A custodian may deny inspection by a person in interest only to the extent that the inspection would:

(i) interfere with a valid and proper law enforcement proceeding;

(ii) deprive another person of a right to a fair trial or an impartial adjudication;

(iii) constitute an unwarranted invasion of personal privacy;

inspection of parts of a public records. Moreover, the MPIA recognizes that "an unwarranted invasion of the privacy of a person in interest" [20] is reason to deny inspection of a public record. *See* § 10–612(b). Read in its totality and in context, it is clear that, in enacting the MPIA, the General Assembly was attempting to balance the right of the public to unfettered access to government records against the "unwarranted invasion of the privacy of a person in interest," *see* § 10–612(b), that unrestricted disclosure would cause. Clearly, it is the threat of, and protection against, an unwarranted invasion of privacy that led to the exclusions found in §§ 10–616 and 10–617. Nonetheless, the Legislature has also instructed, and we have repeatedly affirmed, see *Hammen, supra,* 373 Md. at 457, 818 A.2d at 1136; *Caffrey v. Dept. of Liquor Control for Montgomery County,* 370 Md. 272, 305, 805 A.2d 268, 287–288 (2002); *Office of the Attorney General v. Gallagher,* 359 Md. 341, 343, 753 A.2d 1036, 1037 (2000); *Fioretti v. Md. State Bd. of Dental Examiners,* 351 Md. 66, 73, 716 A.2d 258, 262 (1998); *Kirwan supra,* 352 Md. at 96–97, 721 A.2d at 207, that the MPIA is to be construed in favor of permitting inspection of public records.

Our case law interpreting the MPIA's disclosure requirements is instructive. For example, in *Hammen,* a retired Baltimore County Police Officer, pursuant to an MPIA request, sought to inspect surveillance tapes taken of his activi-

---

(iv) disclose the identity of a confidential source;
(v) disclose an investigative technique or procedure;
(vi) prejudice an investigation; or
(vii) endanger the life or physical safety of an individual."

**20.** Section 10–611(e) defines "person in interest" as

"(1) a person or governmental unit that is the subject of a public record or a designee of the person or governmental unit;
"(2) if the person has a legal disability, the parent or legal representative of the person; or
"(3) as to requests for correction of certificates of death under § 5–310(d)(2) of the Health–General Article, the spouse, adult child, parent, adult sibling, grandparent, or guardian of the person of the deceased at the time of the deceased's death."

Being the subject of the public records sought by the appellees, both Coach Friedgen and Coach Williams are persons in interest.

ties. The videotapes were taken by the county to be used in a separate administrative proceeding related to the re-evaluation of the officer's disability retirements benefits. Denying the request to inspect the videotape, the Baltimore County Office of Law opined that disclosure of the videotapes would be contrary to the decision in *Shenk v. Berger,* 86 Md.App. 498, 587 A.2d 551 (1991). In that case, the Court of Special Appeals addressed the issue of whether surveillance videotapes of an injured party, taken by the opposing party after the alleged injuries had occurred, were subject to Maryland's discovery rules. The intermediate appellate court held that they were, provided that, prior to disclosure, the party having to disclose is afforded the opportunity to depose the injured party. *Shenk, supra,* 86 Md.App. at 506–507, 587 A.2d at 556. In *Hammen,* the defendant agreed to honor the MPIA request, if Hammen would agree to be deposed in a separate proceeding, which he agreed to do. Nevertheless, we concluded that *Shenk* was not applicable because it involved "a private personal injury civil action and did not involve statutorily guaranteed access to public records by a 'party in interest' " *Hammen, supra,* 373 Md. at 452, 818 A.2d at 1133. We held that "the rules of discovery applicable to circuit court proceedings are not, generally, applicable in respect to MPIA proceedings," *id.* at 453, 818 A.2d at 1133, explaining that an MPIA request *"is an attempt to gain statutorily guaranteed access to 'public information,' not private information." Id.* at 457, 818 A.2d at 1135 (emphasis added). Thus, absent some rule of law to the contrary, whatever rights the appellees have to compel disclosure and, conversely, whatever rights the appellants have to deny disclosure, are embodied within the MPIA.

Prior to *Hammen,* this Court addressed the scope of the MPIA in two cases, *Office of the Governor v. Washington Post Co.,* 360 Md. 520, 759 A.2d 249 (2000) and *Kirwan v. The Diamondback,* 352 Md. 74, 721 A.2d 196 (1998). The MPIA request in *Washington Post* sought disclosure of the telephone records of the Governor of the State of Maryland for "all phones in the Governor's Mansion (Government House); his State House offices; all phones in Shaw House (an annex

office in Annapolis); all phones in the Washington and Baltimore offices; all car phones and cellular phones used by the governor and anyone on his staff." In addition, the Washington Post asked to review the scheduling and appointment records of the Governor for a two-year period. Asserting executive privilege, the Governor's Office, denied the request, choosing instead to disclose only the aggregate cost of the telephone calls. In addition, it released the Governor's public agenda, but refused to release the appointment and scheduling records, which, in its opinion, did not constitute public records.

We addressed, as a preliminary matter, whether the provisions of the MPIA applied to the Governor's office. Concluding that the statutory language "clearly encompassed ... [the Governor's office] as a unit or instrumentality of the State government," this Court determined that records of the Governor's office are subject to the right of inspection guaranteed in the MPIA.[21] We concluded that there was no statutory exclusion in the MPIA for certain of the records sought by the Washington Post and, accordingly, required their disclosure. More important, however, to the case *sub judice,* was the determination that phone records from the Governor's Mansion, although technically property owned and paid for by the State and in the possession of the Governor's office, did not come within the definition of "public record," "in light of one's reasonable expectation of privacy in his or her own home." 360 Md. at 537, 759 A.2d at 258. The Court explained:

"In light of the nature of Government House and the role of the Government House Trust, the Governor and his family might not have the identical expectation of privacy while living there as one has in his or her privately owned home.

---

**21.** One of the dissents in *Office of the Governor v. Washington Post,* 360 Md. 520, 565, 759 A.2d 249, 274 (2000), argued that the Maryland General Assembly was precluded, by the doctrine of separation of powers, enumerated in the Maryland Constitution, *see* Article 8 of the Declaration of Rights, Article II, Section 17 of the Maryland Constitution, from enacting laws compelling the Governor's office to disclose the nonpublic activities, such as appointments and scheduling of private interviews, of the Governor.

Nonetheless, we do not believe that the Governor and his family must relinquish all normal expectations of privacy in their home simply because, in accordance with constitutional and statutory provisions, their home and furnishing, including telephone service, are supplied by the State."

*Washington Post, supra,* 360 Md. at 537–38, 759 A.2d at 259. Thus, the determination in *Washington Post,* with respect to the Governor's home telephone bills, turned on this Court's construction of those records as being in their nature private and, therefore, not being the kinds of records that are encompassed within the definition of a "public record" intended by the Legislature. *Id.* at 538, 759 A.2d 249.

Also at issue in *Kirwan v. Diamondback, supra,* was the scope of an MPIA request involving the records of parking citations issued by UMCP to student-athletes, and, coincidentally, to the UMCP head basketball coach, Gary Williams. The MPIA request, made by the campus student-newspaper, was denied by the University, the custodian of the parking citation records, on the basis that they were either personnel records exempt from disclosure under § 10–616(i) of the MPIA or, in the alternative, financial information exempt from disclosure under § 10–617(f) of the MPIA. This Court rejected both rationales. We concluded, instead, that a citation for a parking violation is, in sum, "a charging document accusing the recipient of a petty crime, and the monetary penalty imposed for a parking violation is a fine rather than a debt." 352 Md. at 87, 721 A.2d at 202. As such, we stated, such records did not constitute financial information as defined under the statute and, moreover, "did not fit within the commonly understood meaning of the term 'personnel records.'" *Id.* at 83, 721 A.2d at 200.

We also were not persuaded by the University's argument, pursuant to § 10–618 (permissive denials), that disclosure of the records "is against the public interest." *Id.* at 87–88, 721 A.2d at 202–03. That argument was premised upon the, supposed, "chilling effect" disclosure would have on the University's obligation to self report NCAA violations. The Court concluded that the "public interest" argument did not fall

clearly into categories recognized in § 10–618's permissive denials. *Id.*

Finally, the University argued, citing § 10–612, that disclosure of parking ticket records would be " 'an unwarranted invasion of privacy' because it would subject student-athletes and their families 'to extreme embarrassment and humiliation.' " 352 Md. at 88, 721 A.2d at 203. In response, we stated

> "When an adult commits or is formally charged with committing a criminal offense, even a petty one, it is doubtful that any 'invasion of privacy' occasioned by an accurate newspaper report of the matter is 'unwarranted.' Nevertheless, assuming *arguendo* that one might reasonably believe that such disclosure is an unwarranted invasion of privacy, the Maryland Public Information Act does not contain an exemption for particular cases whenever the disclosure of a record might cause an 'unwarranted invasion of privacy.' Section 10–612(b), previously quoted, related to the 'General Construction' of the Act. It provides that the Act 'shall be construed in favor' of disclosure 'unless an unwarranted invasion of the privacy of a person in interest would result.' The statutory construction issues raised in the present case regarding the Maryland Public Information Act concern the meaning of the terms 'personnel records' and 'financial records.' As explained in Part II A and II B above, the records sought in the present case do not constitute personnel records or financial information. Furthermore, we do not believe that a broader definition of these terms would be justified under the statutory construction principles set forth in § 10–612(b)."

*Id.* at 88–89, 721 A.2d. at 203.

Our cases thus instruct that, in a dispute relating to an MPIA request, a party's right to deny or compel inspection of public records is grounded, almost, if not exclusively, within the Act. The express exemptions set out in §§ 10–616(i) and 10–617(f), are intended to address the reasonable expectation

of privacy that a person in interest has in certain types of records identified by the Legislature.

To be sure, the MPIA expressly requires the disclosure of a state-employee's salary as a matter of public record. *See* § 10–611(g)(2) (defining a public record to include "a document that lists the salary of an employee of a unit or instrumentality of the State government.") and § 10–612. The appellants, while acknowledging that a document evidencing a state-employee's salary is subject to MPIA's disclosure requirements (Petitioner's Brief at 7), maintain that the employment contracts sought by the appellees are either personnel records or financial information exempt under §§ 10–616(i) and 10–617(f). (Petitioner's Brief at 8). With respect to the former, they reason: when § 10–616(i) and § 10–617(f)(1) are read together, it is clear that § 10–617(f)(1) "does not trump the personnel records exemption." They point out that the latter provision "refers to the 'subsection,' meaning § 10–617(f). It does not refer to § 10–616(i)," which it easily could have done, had that been what the Legislature intended.

The appellants also rely on 83 Op. Att'y Gen. 192 (Md.1998), *available at* 1998 Md. AG LEXIS 35 (Opinion No. 98–025, December 18, 1998). In that opinion, the Attorney General, responding to an inquiry from the County Executive for Anne Arundel County concerning "public access to records reflecting individual bonuses or performance awards paid to merit system employees and appointed officials of Anne Arundel County," concluded that "the public is entitled to inspect records that reflect the earnings of government officers and employees, whether those earnings consist solely of a regular salary or are augmented by a bonus or performance award." *Id.* He cautioned, however, that "[t]his conclusion does not imply that the public has an entitlement to the documents establishing the basis for a bonus or performance award[,] for example, performance evaluations. Underlying records of this kind fall within the exemption for personnel records." *Id.* at 192 n. 3. The appellants argue that the employment contract the University has with each coach is an underlying record of the kind to which the Attorney General made reference and,

therefore, comes within the exemption for personnel records found in § 10–616(i). (Petitioner's Brief at 11). So viewing the contracts for employment, they disclosed the salary information that the contracts authorized, but refused to disclose the contracts themselves.

The appellants' argument with respect to § 10–617(f) is premised on the financial information concerning the coaches' contractual and financial arrangements with, and thus payments from, third parties, being personal financial information and not a part of the salary the coaches receive from the State. They note, in this regard, that, while "public record" is broadly defined, the requirement of disclosure is tempered by whether the law provides otherwise. Section 10–617(f) provides otherwise, they assert, by prohibiting "inspection of the part of a public record that contains information about the finances of an individual, including assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness." Thus, the appellants submit:

> "[T]he plain language of the MPIA requires only the disclosure of 'salary' and expressly prohibits the disclosure of 'income.' Had the Legislature intended that State agencies disclose private income of an individual 'derived from any university asset,' it could have easily so provided. But those words do not appear in the statute.... The plain meaning of SG § 10–617(f)(2) requires that a custodian deny inspection of a public record that contains information about [the] finances of an individual, including income. There is no exception for income 'derived from any university asset.'"

(Citations omitted). The need to give effect to the plain language of the statute is not trumped, the appellants conclude, by the statutory direction to construe the MPIA in favor of permitting inspection of a public record.

█ This court is not persuaded by the appellants' personnel records argument. Moreover, the MPIA clearly requires, as all of the parties agree, the disclosure of the "salary of an employee of a unit or instrumentality of State government."

§ 10–611(g)(2). That certainly would include the dollar amount paid. We believe that the requirement must include, in addition, disclosure of any document evidencing the employment arrangement and how the state-funded salary is earned.

■ A public record includes documentary material, in any form, made, or received, by a unit or instrumentality of State government in connection with the transaction of State business. A contract between the University and the coaches of their athletic teams entered into after negotiations is the result of, and indeed, is, the transaction of State business. While it may not fall neatly into the definition of salary, a contract setting out the rights and responsibilities of each party to it and the circumstances and conditions governing the coaches' entitlement to receive the salary is not only a document entered into, i.e. made by and received by the University in connection with the transaction of public business, but it certainly informs and gives context to "salary." Indeed, the purpose of the MPIA, *see* § 10–612(a) ("all persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees"), is better served when the full context in which the salary is due or paid is known, i.e., fully disclosed. That is achieved only when the contract itself is disclosed. Thus, it is clear that the employment contracts evidencing the regular salaries paid to each coach by the University, and their obligations and rights, are exactly the types of records to which the Legislature intended the public to have access.

We are not persuaded that the employment contracts are themselves the kinds of underlying documents referred to by the Attorney General and argued by the appellants. They may establish the basis for the salary, for they state the rights and obligations of the coach in order to earn the contractual remuneration, but they are not in the nature of a performance evaluation. Thus, under the legislative policy favoring disclosure of public records, we conclude that they do not fall within the exemption for personnel records found in § 10–616(i).

Moreover, denial of inspection of the employment contracts would contribute to the lack of public understanding of the amounts earned by Coach Friedgen and Williams as a result of their public employment and would thwart the achievement of the goal of the MPIA. We, therefore, hold that the employment contracts and any amendments thereto, side letters or documents reflecting the total compensation and sums of monies paid directly by the University to Coaches Friedgen and Williams must be disclosed. The terms of the employment contract are essential to an understanding of the salaries paid to the coaches, especially in light of the various alternatives for compensation potentially available to the coaches, *supra* note 8, in the form of car allowances, country club memberships, complimentary ticket sales, use of state-owned resources for clinics and camps, etc. Consequently, the trial court correctly ordered disclosure of the records evidencing payments of state funds to Coach Friedgen and Coach Williams.

We reach a different result, one contrary to that reached by the trial court, with respect to records of financial arrangements between the coaches and third parties.

There are, to be sure, benefits that flow from being the head football or basketball coach at an institution like UMCP. As with any employment opportunity, there are both benefits and burdens. Along with status and celebrity, these positions afford the individuals holding them with a wide array of business and financial opportunities. Often, these opportunities result in financial remuneration from third parties over and above that called for by, but nevertheless consistent with, the contract with the University. As employees of the State of Maryland, Coach Friedgen and Coach Williams share in the burden with the thousands of other state employees whose employment terms and affairs are subject to the inspection requirements of the MPIA. To date, the MPIA does not provide an exception for head coaches who work at schools with NCAA programs.

While it is true that the records evidencing these third party transactions are in the appellants' possession, we must also note that these records have come to be there only by virtue of the regulations governing the relationship between the University and the NCAA. Not only does the MPIA not require the University to collect these records, no Maryland statute requires the Coaches to provide these documents. Nonetheless, balancing the public's right of access to the affairs of government and the caution against unwarranted invasions of privacy, articulated in § 10–612, as manifested in the Legislature's exemption of certain financial information from disclosure pursuant to § 10–617(f), we do not believe the records of the private business affairs of Coaches Friedgen and Coach Williams, including contracts with third parties, unrelated to their public employment, are required to be disclosed.

The situation may be different, however, when the contract with the third party, and the income flowing therefrom, are so connected with, and related to, the coach's public employment as to be, in effect, authorized by, and thus, a part of, the University contract. Although, as articulated above, the MPIA is to be construed so as to promote disclosure of public documents, the General Assembly simply, and clearly, provided that a custodian deny "the part of a public record that contains the finances of an individual, including assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness." § 10–617(f)(2). Therefore, the decision whether it is appropriate to disclose the third party contract under the MPIA is one that cannot be made in a vacuum. Rather, to determine whether disclosure is appropriate, both the University contract and the third party contract will have to be reviewed in tandem. The University contract must be reviewed to determine whether, arguably, it authorizes or contemplates the third party contract or contracts similar thereto. And the terms of the third party contract must be reviewed in order to determine whether the income derived by that contract is closely connected with, and related to, the coach's employment with the University, to determine,

in other words, whether, but for the coach's employment with the University, the third party contract would not have been made, or many of its terms included.[22]

The NCAA by-laws require that a coach must report annually to the member institution the sources of his or her athletically related income from third parties, and thus, make the third party contracts relating to athletically related income important when discussing the University's employment contract with the coaches.

We have also pointed out that, under the circumstances where public employment and remuneration, subject to the MPIA, and private employment and remuneration, not subject to the MPIA, intersect, the ability to comply with the MPIA is dependent on reviewing the contracts governing both in tandem. An unwarranted disclosure of private financial information can be avoided by the review being made by the trial court *in camera.* During that *in camera* review, the court must construe the MPIA as the Legislature enacted it, and not give it a forced or strained meaning. *See Kolzig,* 375 Md. at 568–569, 826 A.2d at 469–470; *Holbrook v. State,* 364 Md. 354, 364, 772 A.2d 1240, 1246 (2001); *Graves v. State,* 364 Md. 329, 346, 772 A.2d 1225, 1235 (2001); *Haupt v. State,* 340 Md. 462, 471, 667 A.2d 179, 183 (1995) *Brown v. State,* 285 Md. 469, 474, 403 A.2d 788, 791 (1979).

If the court determines that Coach Williams is receiving payments from companies solely as a result of his position as coach at UMCP, and that the income is intimately connected to his activities as coach of UMCP, then that income is part of his compensation and subject to disclosure. Thus, for instance, if the third party contract requires that the members of the basketball team wear that party's shoes or clothing

---

**22.** That both coaches may profit, even handsomely, from these third party financial arrangements, by virtue of their employments as head coaches at UMCP, must be conceded, and, indeed may be a strong, even a persuasive argument for requiring the disclosure of, not simply the salaries of state employees, but third party payments, as well, however the mere existence of said compensation is not determinative of whether it is properly disclosed under the MPIA.

during UMCP basketball games, the court may find that the financial benefit to the coach is directly related to the coach's status with the University and, therefore, order the contract pursuant to which it is paid disclosed. On the other hand, if after reviewing the contract terms, the court is convinced that the payments the coach is receiving from the third party company, although prompted by his position as an NCAA coach, and the University's coach in particular,[23] are not so connected with or related to his activities as coach of UMCP as to render the contract proceeds a part of his official compensation, the contract is not subject to disclosure under the MPIA.

We conclude that the records evidencing contracts and agreements, to which the University is not a party, providing income to the coaches and supplied by third parties, must be viewed by the lower court, *in camera*, in order to determine whether they are financial information within the contemplation of § 10–617(f) and, thus, are not required to be disclosed pursuant to the MPIA.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED IN PART AND RE-**

---

23. Coach Williams' honors, for example, include:
   - Naismith National Coach of the Year Finalist, 1995, 1997, 2002
   - National Coach of the Year, 2002 (Basketball America, CBSSportsline.com)
   - Atlantic Coast Conference Coach of the Year, 2002
   - Victor Award, 2002 (National Academy of Sports Editors)
   - Winged Foot Award, 2002 (N.Y. Athletic Club)
   - Harry Litwack Eastern Coach of the Year Award, 2002 (Herb Good Basketball Club of Philadelphia)
   - District Coach of the Year, 2002 (Basketball Times)
   - Seaboard Region Coach of the Year, 1997, 2002 (Basketball Times & Eastern Basketball)
   - National Coach of the Year, 2001 (Playboy)
   - Atlantic Coast Conference Coach of the Year, 2000 (College Hoops Illustrated)
   - Atlantic Coast Conference Coach of the Year, 1998 (ACC Athlete Magazine)
   - U.S. Olympic Team Selection Committee, 1988

*See* University of Maryland Official Athletics Official Site, Coaches, *available at* ht tp://umterps.ocsn.com/sports/m-baskbl/mtt/williams_gary00.html (last visited March 12, 2004).

VERSED IN PART. CASE REMANDED TO THAT COURT FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE HALF BY THE APPELLANTS AND ONE HALF BY THE APPELLEES.

HARRELL, J., concurs in part and dissents in part.

HARRELL, J.

Although I agree with most of the Majority's reasoning and conclusions, I respectfully dissent with regard to the Majority's reasoning that either coach's income received from a private contract with a third-party, outside of State government, can somehow be so "closely connected," "intimately connected," or "related" to the coaches' employment by the State as to morph into a part of the salary paid by the State. Maj. op. at 104–06, 847 A.2d 441–43. The salary of a public employee is paid by the State. The MPIA simply and clearly distinguishes between salary and income so that the privacy of the non-salary finances of an individual is protected against an unwarranted invasion. Balancing the public's right of access to the affairs of government against an individual's right to privacy, articulated in § 10–612, as manifested in the Legislature's exemption of certain financial information from disclosure under § 10–617(f), I conclude that the records of the private business affairs of Coach Friedgen and Coach Williams categorically do not warrant disclosure, let alone *in camera* examination.

As is customary in matters of statutory interpretation, we begin by reminding ourselves of the pertinent rules of interpretation. "The goal with which we approach the interpretation of a statute or ordinance is to determine the intention of the Legislature enacting it." *County Council of Prince George's County v. Dutcher*, 365 Md. 399, 416, 780 A.2d 1137, 1147 (2001) (citation omitted). It is well settled that

the cardinal rule is to ascertain and effectuate legislative intent. To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly

understood meaning, we end our inquiry there also. Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to reflect an intent not evidenced in that language, nor may it construe the statute with forced or subtle interpretations that limit or extend its application. Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.

*Id.* (citations and formatting omitted) The language of the MPIA statute is clear and unambiguous. The plain language clearly states that "salary" must be disclosed and the parts of public records that contain financial information not relating to salary are excluded from inspection. § 10–617(f)(1). MERRIAM WEBSTER'S NINTH COLLEGIATE DICTIONARY 1031 (10th ED. 1989) defines salary as "fixed compensation paid regularly for services." As regards the finances of an individual, the General Assembly provided that a custodian deny disclosure of "the part of the record that contains the finances of an individual, including assets, income, liabilities, net worth, bank balances, financial history or activities, or creditworthiness." § 10–617(f)(2).

By enacting the MPIA, the Legislature expressly chose to exempt from disclosure public records that contain information about the personal finances of an individual, including income, that do not constitute salary paid by the State. The information that the University holds about the contracts between the coaches and third parties is financial information about income from outside sources that is not part of the coaches' salaries. Moreover, those documents are collected by the University, not as part of any requirement of State Law, but in obeisance to NCAA regulations. The Legislature has not required the inspection of public records that reflect all sources of a State employee's income—it chose not to do so. I would conclude, therefore, that the records evidencing contracts and agreements providing income to the University's coaches supplied by third parties, and to which the University is not a party, are financial information other than salary information under § 10–617(f). Thus, those documents and

the information contained therein are not required to be disclosed pursuant to the MPIA.